UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| Roger D. Smith, Marcus P. McKinley, William R. Johnson, Sandra Rush and Judy Riggs, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> Aramark Corporation, Aramark Correctional Services, LLC, and Union Supply Group, <br><br> *Defendants.* | Case No. <u>2:25-cv-00710</u> <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I.     INTRODUCTION

1.     Plaintiffs Roger D. Smith, Marcus P. McKinley, and William R. Johnson are consumers incarcerated in the Mount Olive Correctional Complex in Fayette County, West Virginia ("Mt. Olive"). Plaintiffs Sandra Rush and Judy Riggs are consumers who have family members and loved ones who are or have been incarcerated at Mt. Olive. Plaintiffs bring this action on behalf of themselves and the class and subclasses defined below to stop Defendants'—Aramark Corporation; Aramark Correctional Services, LLC; and Union Supply Group (collectively, "Aramark")—ongoing violations of the West Virginia Consumer Protection Act, W. Va Code §§ 46A-6-101, *et seq.*, (2015) ("WVCCPA") and related laws.

2.     Aramark is a national food service company headquartered in Philadelphia, Pennsylvania. Among other things and relevant to this action, Aramark provides the mandated free daily meals services to people incarcerated in correctional facilities in West Virginia under its contract with the State, which the State pays for and requires to be provided. Aramark also

provides all options that consumers have for purchasing food in these facilities. These food-for-purchase programs include Aramark's commissary; its "Fresh Favorites" program, available to incarcerated consumers; and its "iCare" program through which consumers can purchase and send food to incarcerated family members and loved ones.[1] As such, Aramark has exclusive control over all food provisions in West Virginia's correctional facilities, including at Mt. Olive.

3.      Aramark is engaging in a scheme by which it extorts profits from incarcerated consumers and their loved ones by failing to provide incarcerated people with adequate, free daily meals services, so they are driven to purchase commissary food, meals from Aramark's Fresh Favorites program, or iCare packages.

4.      Incarcerated consumers at Mt. Olive are a captive market and have no choices for obtaining or purchasing food other than through Aramark. They are not allowed to receive food directly from family members or other loved ones, and they are not allowed to purchase food from any vendor other than Aramark. For this reason, family members and loved ones who are not incarcerated are also a captive market when they seek to buy food for incarcerated people. Aramark exploits its position of exclusive control over both the mandated free daily meals services and food-for-purchase programs to perpetuate this scheme, by limiting the quality, quantity, and variety of daily meals services, thus driving incarcerated consumers to purchase

---

[1] Commissary is a retail store in which incarcerated consumers can purchase food and drinks, among other items, using their own money, or through which family and loved ones can purchase quarterly care packages. "Fresh Favorites" is described by Aramark as a "retail experience" where incarcerated consumers can buy "special meals" using their own money. Fresh Favorites offerings include a variety of perishable food items, such as yogurt and fresh vegetables. *See Aramark Correctional Services*, Aramark, https://www.aramark.com/industries/business-and-government/corrections/our-innovation [https://perma.cc/8VT4-S68T] (last visited Nov. 4, 2025). iCare is the exclusive means by which consumers can directly send food to family members and loved ones at Mt. Olive; it is an Aramark program that allows people to purchase and send gift packages with meals to their incarcerated loved ones. *Id*.

food from its food-for-purchase programs. By doing so, Aramark extracts a profit on both ends; it saves costs on its daily meals services business by providing less, reused, and poor-quality food, while earning more money from incarcerated consumers' purchases from its food-for-purchase programs.

5.      Aramark knows or should know that incarcerated consumers are not receiving adequate daily meals because its contracts with the State contain detailed and objective criteria governing its daily meals services, which it does not meet. In addition, numerous individuals, including the incarcerated Plaintiffs, have filed formal grievances and lodged informal complaints about the inadequate food and expensive food-for-purchase programs. Aramark is provided with inmate grievances and complaints about these problems.

6.      Upon information and belief, Aramark incentivizes its employees to engage in its scheme by giving them bonuses when they save money on daily meals services, which Aramark's employees do by providing less food, limiting the variety of food, substituting cheaper processed food for fresh food, or reusing leftovers that should be discarded due to being past their expiration date or spoiled.

7.      As a result of Aramark's conduct, incarcerated consumers at Mt. Olive are forced to buy food with money that they could use for other purposes, such as communicating with family, purchasing over-the-counter medications, or saving for reentry, and Aramark has and continues to illegally profit off them. Their family members and loved ones could support them in any number of ways to assist with their rehabilitation, but they instead have to use their money to purchase iCare food packages to supplement Aramark's inadequate daily food services for their loved ones. Moreover, family members and loved ones are diverting funds they could otherwise use to support themselves and their families, which is especially problematic for

3

family members who had relied on their incarcerated loved ones for financial and other support, which they have lost due to incarceration. Plaintiffs seek monetary, declaratory, and injunctive relief on behalf of themselves and all others similarly situated to stop Aramark's illegal conduct.

## II.    PARTIES

8.      Plaintiff Roger D. Smith is an individual incarcerated in the Mt. Olive Correctional Complex located at 1 Mountain Side Way, Mount Olive, West Virginia, 25185.

9.      Plaintiff Marcus P. McKinley is an individual incarcerated in the Mt. Olive Correctional Complex located at 1 Mountain Side Way, Mount Olive, West Virginia, 25185.

10.     Plaintiff William R. Johnson is an individual who formerly was incarcerated in the Mt. Olive Correctional Complex located at 1 Mountain Side Way, Mount Olive, West Virginia 25185. In November 2025, Mr. Johnson was moved to the Northern Regional Correctional Facility located at 112 Northern Regional Correctional Dr, Moundsville, WV, 26041.

11.     Plaintiff Sandra Rush has a son who is currently incarcerated in the Mt. Olive Correctional Complex. Ms. Rush lives at 359 Simpson Street, Clarksburg, WV, 26301.

12.     Plaintiff Judy Riggs had a brother who was incarcerated in the Mt. Olive Correctional Complex until he passed away in July 2025, as well as a loved one who is currently incarcerated at Mt. Olive. Ms. Riggs lives at 2307 Pleasant Avenue in Wellsburg, West Virginia 26070.

13.     Defendant Aramark Corporation is a Delaware corporation headquartered at 2400 Market Street, Philadelphia, Pennsylvania 19103.

14.     Defendant Aramark Correctional Services, LLC, is a Delaware Limited Liability Company and a wholly owned subsidiary of Aramark Corporation. Aramark Correctional

Services, LLC, provides food, commissary services, and its Fresh Favorites program to correctional facilities throughout the United States, including at Mt. Olive. It is headquartered at 2400 Market Street, Philadelphia, Pennsylvania 19103.

15.     Defendant Union Supply Group ("Union Supply") is a subsidiary of Aramark Corporation and was acquired by Aramark Corporation in 2022 to provide commissary services in West Virginia. Union Supply's corporate headquarters is located at 2500 Regent Blvd, Dallas, Texas 75261.[2]

### III.     JURISDICTION AND VENUE

16.     This action arises under the WVCCPA.

17.     This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(d) because there are at least 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one class member is domiciled in a different state from Defendants.

18.     The Court has personal jurisdiction over Defendants because Defendants operate, conduct, and engage in substantial business in this judicial district, including but not limited to contracting with the State to provide food services, commissary, Fresh Favorites, iCare, and other services to jails and prisons throughout West Virginia; Defendants committed and continue to commit legal violations in West Virginia, which have caused injury to individuals in West Virginia, and a substantial portion of the actions giving rise to Plaintiffs' claims took place in West Virginia.

---

[2] Defendants Aramark Corporation; Aramark Correctional Services, LLC; and Union Supply are referred to collectively as "Aramark."

19.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## IV.     FACTUAL ALLEGATIONS

### A.     Aramark's scheme uses food to unfairly profit off incarcerated consumers.

20.     Food is a uniquely powerful tool to exploit; it is essential for survival, health, morale and success. Aramark knows this.

21.     Aramark claims that it changes lives and impacts incarcerated consumers' futures through its food services program. It recognizes the vital importance of proper nourishment, even claiming that it is "breaking the cycle of recidivism" with its food services.[3] Aramark knows that fresh food "boosts morale," and that food choice and access to fresh food is a "behavior management tool." *Id*. Aramark advertises that it "create[s] better food experiences because everyone we serve deserves the respect and dignity of a healthy, nourishing diet." *Id*.

22.     As Tim Barttrum, the President and CEO of Aramark Correctional Services stated, "We see the impact on an individual's future in our clients' facilities every day by recognizing their potential and using food as a tool to realize it."[4]

23.     Aramark's marketing theme for its food-for-purchase programs centers on "freshness" and "flavor" to entice consumers to purchase it. Its marketing materials contain pictures of fresh vegetables and a variety of foods:

---

[3] *Aramark Correctional Services*, Aramark, https://www.aramark.com/industries/business-and-government/corrections [https://perma.cc/V5JR-KG2A ] (last visited Nov. 4, 2025).
[4] *Sharing a Meal with a Justice-Impacted Loved One*, Aramark Newsroom, https://www.aramark.com/newsroom/news/2022/corrections-icare-visitation-meals [https://perma.cc/3NT3-6LDS ] (last visited Nov. 4, 2025).



FreshFavorites®

Boost morale with FreshFavorites®, a retail experience that gives inmates the chance to purchase special meals using their trust fund. [5]

24.     Exploiting food as a tool is central to Aramark's scheme, which includes three components: (1) obtaining exclusive control over all of the food provisions available to incarcerated people by acquiring the commissary business of Union Supply, (2) maintaining an

---

[5] Photograph of Fresh Favorites salad in *Aramark Correctional Services*, Aramark, https://www.aramark.com/industries/business-and-government/corrections/our-innovation [https://perma.cc/8VT4-S68T] (last visited Nov. 4, 2025).

inadequate quality, quantity, and variety of food in the daily meals services that it is required to provide to incarcerated people through its contract with the State, and (3) developing more food-for-purchase programs such as Fresh Favorites and iCare.

25.    The result of Aramark's scheme is inevitable: incarcerated people and their family members and loved ones are buying food they would not otherwise buy to supplement incarcerated people's diets, resulting in direct profits to Aramark at the expense of incarcerated people and their families.

26.    Aramark unlawfully profits from its scheme in two ways: on the front end, by improperly cutting costs on its daily meals services by providing inadequate food (but retaining the same rate of pay from the State as if they were providing appropriate meals), and on the back end, by reaping profits from its food-for-purchase programs by driving purchases by incarcerated consumers.

**B.    Aramark Corporation purchased Union Supply so it would have exclusive control over a captive market to drive profits.**

27.    Aramark Corporation is a multi-billion-dollar, Fortune 500 company and is a leading global provider of food services.[6] Through its subsidiary, Aramark Correctional Services, Aramark Corporation is the largest provider of food services to prisons and jails in the United States.

---

[6] According to Aramark's latest annual financial report, the company's revenue for fiscal year 2024 was $17.4 billion. *Aramark Reports Earnings Results for Fiscal 2024*, Aramark, 2 (2025), https://aramark.gcs-web.com/static-files/a09d266a-b11d-4a3c-a427-50378190b22d. It is ranked 239 on the 2025 Fortune 500 list. *See List of 'Fortune 500' Companies*, 50Pros (last updated Sept. 1, 2025), https://www.50pros.com/fortune500 [https://perma.cc/YG7W-DFPK] (last visited Nov. 4, 2025).

28.    Union Supply is dedicated exclusively to supplying the correctional industry and has become the fastest-growing commissary provider in the industry.

29.    In 2022, Aramark Corporation, through Aramark Corrections Services, LLC, acquired Union Supply for $202.6 million, and Union Supply became a wholly owned subsidiary of Aramark.[7]

30.    By purchasing Union Supply, Aramark Corporation gained exclusive control over food provisions in certain facilities, including at Mt. Olive in West Virginia. Incarcerated consumers are literally a captive market, with Aramark now uniquely positioned to exploit them. Moreover, because food is a basic necessity essential for survival, Aramark can and does wield its power to effectuate its scheme.

### C.    Aramark has shifted its mandatory daily meals services to a food-for-purchase model.

31.    Aramark has created an increased demand for its food-for-purchase business by limiting the quality, quantity, and variety of food in its free daily meals service.

32.    Aramark offers a variety of food-for-purchase options in prisons, including commissary food and "Fresh Favorites" meals.

33.    Commissary is a retail store in which incarcerated consumers can purchase food and drinks, among other items. Aramark explains that its commissaries "treat inmates like consumers and can serve as a valuable behavior management tool."[8]

---

[7] *United States Securities and Exchange Commission Aramark Form 10-Q*, SEC Gov't Archives, 10 (2022), https://www.sec.gov/Archives/edgar/data/1584509/000158450922000156/cik0-20220701.htm [https://perma.cc/UD3U-CD96] (last visited Nov. 4, 2025).

[8] *Aramark Correctional Services*, Aramark, https://www.aramark.com/industries/business-and-government/corrections/our-innovation [https://perma.cc/8VT4-S68T] (last visited Nov. 4, 2025).

34.     Aramark's "Fresh Favorites" is a "retail experience" where incarcerated consumers can buy "special meals" using their own money. The Fresh Favorites meals include fruit-flavored yogurts, fresh vegetable trays, fried chicken, BLT sandwiches, and baked potatoes, which it has otherwise limited the availability of in its daily meals service. Aramark recognizes the significant value to incarcerated consumers of having access to a variety of fresh, flavorful foods, and promotes buying from Fresh Favorites as a way to "boost morale."[9]

35.     Family members and loved ones of incarcerated people can purchase food for them through Aramark's "iCare" product, which provides "fresh meals" to people who are incarcerated.[10] Aramark markets its iCare packages to consumers through its website and by emails and other communications, touting the freshness and flavor of the food. Aramark's advertisements promote sending food as a means to allow family members to stay connected to their incarcerated loved ones.

36.     In addition to the injustice of having to pay for food that they are entitled to receive for free through mandated daily meals services, having to pay for food from Aramark's commissary and Fresh Favorites programs is especially burdensome for incarcerated consumers like the Plaintiffs who earn nominal wages, if any.

37.     Aramark is unlawfully driving incarcerated consumers and their family members and loved ones to supplant its required daily meals services with food-for-purchase options to increase its profits at the expense of Plaintiffs and the class.

[9] *Aramark Correctional Services*, Aramark, https://www.aramark.com/industries/business-and-government/corrections/our-innovation [https://perma.cc/UD3U-CD96] (last visited Nov. 4, 2025).
[10] *About iCare*, iCare, https://www.icaregifts.com/aboutus.html [https://perma.cc/PU3S-KZ68] (last visited Nov. 4, 2025).

38.    If Aramark honored its contractually mandated daily meals services obligations, incarcerated consumers and their family members and loved ones would spend less money on food purchases and have more money to spend on other essentials such as communicating with family members, toiletries, clothing, educational opportunities, and preparing for release.

**D.    Aramark drives the demand for its food-for-purchase programs by limiting the quantity, quality, and variety of food served in its daily meals service.**

39.    Aramark provides inadequate daily meals services by providing inadequate quantities of food, inappropriately reusing left over and spoiled food, and failing to serve required amounts and varieties of fresh foods such as vegetables, unprocessed meats, and dairy.

40.    Aramark regularly fails to provide sufficient ingredients for its own recipes, including providing grossly insufficient (and at times no) amounts of meat, dairy, and vegetables required for the recipes.

41.    The West Virginia Center on Budget & Policy issued a report in 2023 that examines in detail Aramark's failure to meet its contractual food services obligations and the decline in the quantity and quality of free daily meals available to incarcerated people since Aramark's contract began.[11]

42.    Numerous stories from incarcerated consumers, including the named Plaintiffs, set forth in grievances and letters, provide examples of Aramark's inadequate daily meals services at Mt. Olive.

---

[11] Teri Castle and Sara Whitaker, *The High Costs of Cheap Food: Eating in West Virginia's Prisons*, WV Ctr. on Budget & Pol'y, (2023), https://wvpolicy.org/wp-content/uploads/2023/09/The-High-Cost-of-Prison-Food.pdf [https://perma.cc/EVR2-TM5V] (last visited Nov. 4, 2025).

43.     And in another West Virginia facility where Aramark provides food services, a 2022 class-action lawsuit contained allegations that Aramark is serving rotten food and inadequate portions.[12]

44.     In still another West Virginia correctional facility where Aramark provides food services, recent reporting alleges that Aramark ended free-flow salad bar services at lunch and dinner. In its place, Aramark serves "highly processed meals and charg[es] prisoners for fresh fruits and vegetables as an add-on service called Fresh Favorites."[13]

45.     These West Virginia accounts mirror a nationwide problem, as Aramark Corporation has been repeatedly accused of severe health and safety violations, sanitation violations, unauthorized food substitutions, undercooked food, and food shortages where it has done business in correctional facilities across the country.

46.     For example, in 2015, Michigan canceled Aramark's contract to provide food to its prisons and jails and fined the company because of food shortages and unauthorized menu substitutions, among other things.[14]

47.     In 2019, Aramark was sued for serving expired and spoiled food, as well as food infested with rodent, insect, and bird droppings in California's Santa Rita Jail.[15]

48.     Incarcerated people in Mississippi filed a lawsuit against Aramark complaining

---

[12] *Rose v. Sandy*, No. 5:22-CV-00405 (S.D.W.V), Complaint (including sworn affidavits from four correctional officers at Southern Regional Jail, who alleged, *inter alia*, that incarcerated residents were "regularly served spoiled milk for breakfast," "given inadequate portions of food," and "commonly given what appeared to be undercooked or rotten meat" at 17).

[13] Keaton Ross, *Oklahoma Looks to Privatize Prison Food Service*, Oklahoma Watch, (2025), https://oklahomawatch.org/2025/02/07/oklahoma-looks-to-privatize-prison-food-service/ [https://perma.cc/97FD-7CC3] (discussing Lakin Correctional Center in West Virginia).

[14] *E.g., Aramark: Prison Food for Thought*, Prison Legal News, (2024), https://www.prisonlegal news.org/news/2024/may/1/aramark-prison-food-thought/ [https://perma.cc/47GM-AB3V] (last visited Nov. 4, 2025).

[15] *Id.*

that the food was often "spoiled, rotten, molded or uncooked" and that portion sizes were too small.[16]

49.    Similarly, in Ohio prisons, maggots were found in Aramark's foods.[17]

50.    After Missouri contracted with Aramark in 2023, the food quality "went from bad to worse."[18]

51.    Aramark's daily meals services are objectively inadequate because they fail to meet the comprehensive and specific contractual requirements set forth in its contract with West Virginia.

52.    Beginning in 2019 to the present, Aramark has had a contract with the State to provide food services to people incarcerated in West Virginia.

53.    Aramark's contract with the State sets specific goals and objectives with which Aramark agreed to comply, including with respect to the quality, quantity, and variety of food required for Aramark's daily meals services.

54.    Among other things, the contract requires Aramark to provide:

    a.    Appetizing and nutritional food;

    b.    A vast variety of meats, vegetables, grains, and beverages on the five-cycle menu rotation;

    c.    Wholesome, fresh products for the food preparation; and

    d.    Proper food sanitation and storage, with specific requirements for certain foods such as dairy and bread products.

---

[16] *Id.*
[17] *Id.*
[18] Meg Cunningham, *People in Missouri prisons say food went from bad to worse when contractor took over*, The Beacon News, (2023), https://thebeaconnews.org/stories/2023/10/04/missouri-department-of-corrections-aramark-contract/ [https://perma.cc/2WJ2-HVKQ], (last visited Nov. 4, 2025).

55.     These contractual requirements are consistent with established public policy in West Virginia relating to the quality of food that should be available to incarcerated people.

56.     For example, in 2019, West Virginia passed The Fresh Food Act, in which it declared that incarcerated people shall have "wholesome and sufficient food." W. Va. Code § 7-8-2a(a). The law recognizes that "[l]ocally grown food is healthier and more beneficial to the environment than food imported from other states and other countries." W. Va. Code § 19-37-1(b).

57.     The Agriculture Commissioner complained in 2022 that Aramark failed to comply with the Fresh Food Act; however, the West Virginia Department of Agriculture does not have authority to enforce the law.[19]

58.     In addition, ingredients in Aramark's meals are sometimes inconsistent with its daily menus. For example, its menus will tout 100% beef, but the beef used is highly processed and mixed with additives. In another example, Aramark's menus provide for whole muscle breaded fish patties, but the fish patties served are highly processed and contain over a dozen different minced fishes mixed with fillers.

59.     As a result of Aramark's failure to provide adequate mandatory daily meals services, incarcerated people at Mt. Olive are forced to purchase food from Aramark, if they can afford it.

**E.     Aramark's food scheme is unfair and is injuring consumers incarcerated at Mt. Olive.**

60.     The cost of purchasing food from commissary, Fresh Favorites, and iCare is

---

[19] Teri Castle and Sara Whitaker, *The High Costs of Cheap Food: Eating in West Virginia's Prisons*, WV Ctr. on Budget & Pol'y, (2023), https://wvpolicy.org/wp-content/uploads/2023/09/The-High-Cost-of-Prison-Food.pdf [https://perma.cc/EVR2-TM5V] (last visited Nov. 4, 2025).

expensive for incarcerated consumers and their families, given that even for those who do work

while incarcerated, the national average daily wage is $0.86 per hour.[20]

62.    For example, people incarcerated at Mt. Olive can purchase a "Fresh Veggie tray"

for $10.00. In other words, an incarcerated person at Mt. Olive must work for more than 11

hours to eat a single plate of fresh vegetables.

62.    As a result of Aramark's conduct, incarcerated consumers and their family

members and loved ones are spending money for food that they could otherwise use for other

basic necessities, such as communicating with loved ones, purchasing clothing and toiletries, or

for other purposes.

63.    Aramark has reaped ill-gotten gains from its unfair food services scheme.

**F.    Plaintiffs are being harmed by Aramark's conduct.**

**a.    Plaintiff Roger D. Smith**

64.    Plaintiff Roger D. Smith has been incarcerated at Mt. Olive since March 16, 2007.

65.    Since being incarcerated, Mr. Smith has witnessed a severe decline in the quality

and quantity of the food provided to people incarcerated at Mt. Olive.

66.    In the early years of his incarceration, multiple items were available as free-flow

items during meals, including salad. Leftovers used to be available as free-flow items.

67.    Now, however, few if any items are available as free flow.

68.    Recently the quality of the food has declined. For example, most vegetables are

canned and reheated for meals.

---

[20]Prison Policy Initiative, *Economics of Incarceration*,
https://www.prisonpolicy.org/research/economics_of_incarceration/#:~:text=Average%20daily%
20wage%20of%20incarcerated,lifetime%20by%20being%20incarcerated%3A%20%24500%2C
000%20%2B [https://perma.cc/PGS4-LQX5] (last visited Nov. 4, 2025).

69.    Mr. Smith has also experienced decreased variety in the food served. For example, Aramark has replaced fresh ground beef with turkey pellets that do not have the consistency of fresh meat for most meals that are supposed to include meat.

70.    Because of the poor quality and quantity of food provided, like many incarcerated people, Mr. Smith supplements his diet from the commissary.

71.    Mr. Smith spends approximately $40 to $50 per month on food. He purchases predominantly soups and nuts.

72.    Like others, Mr. Smith is unable to access fresh, healthy items such as vegetables because they are too expensive.

73.    Mr. Smith worked in the kitchen for approximately two months in late 2021, in the period when Aramark was finalizing its acquisition of Union Supply. During this time, he witnessed kitchen workers pick bugs out of gravy that was then served to the incarcerated population.

74.    Mr. Smith also witnessed old, frozen food being stored and then served days later to the segregation, mental health, and medical units. These were not the meals that were on the daily meal menus.

**b.    Plaintiff Marcus P. McKinley**

75.    Plaintiff Marcus P. McKinley has been incarcerated at Mt. Olive since January 1, 2014.

76.    Since being incarcerated, Mr. McKinley has seen the quality and quantity of the food provided decline.

77.    Mr. McKinley is a Pod Representative at Mt. Olive, and the number one issue incarcerated people complain about is the food they are served by Aramark.

78.    Mr. McKinley has heard from incarcerated people that work in the kitchen that Aramark staff do not add all of the ingredients to recipes that are supposed to be added. For example, if a meal calls for 20 pounds of meat, Aramark only gives the workers 12 pounds of the meat to add to the meal.

79.    When Mr. McKinley first arrived at Mt. Olive, the daily food services included a wide variety of fresh meats, real dairy and eggs, and vegetables. Now, most of the meat that Aramark serves is in the form of processed pellets, and the eggs are bagged eggs. Leftovers are frequently substituted for fresh meals.

80.    Over the past approximately two years, the portion sizes of food provided have been so small that Mr. McKinley and others are often not full after eating their meals.

81.    Like others, Mr. McKinley has to supplement his diet with food items from the commissary.

82.    Mr. McKinley spends approximately $50 to $60 per month on food, despite making only approximately $70 per month.

83.    While waiting in line to get his meals, Mr. McKinley has seen Aramark's advertisements for Fresh Favorites, touting fresh vegetables and a variety of offerings to the incarcerated people while they are being served Aramark's insufficient, bland, and processed food.

**c.    Plaintiff William R. Johnson**

84.    Plaintiff William R. Johnson was incarcerated at Mt. Olive Correctional Complex from April 9, 2009 until November 2025, at which time he was moved to the Northern Correctional Facility.

85.    While incarcerated at Mt. Olive, Mr. Johnson saw a substantial decline in the

quality and quantity of the food provided to people incarcerated there.

86.    When he was first incarcerated, Mr. Johnson and the other people incarcerated at Mt. Olive were provided with fresh vegetables and a variety of unprocessed meats. Items like steak and fried eggs were occasionally on the menu, while items like biscuits and gravy were provided as free-flow items.

87.    Over the past few years, however, the quality and quantity of the food provided declined.

88.    Furthermore, the kitchen often ran out of the food that is listed on the daily menu, which is required to offer a variety of foods, and instead gives incarcerated people the same ingredients over and over. This happens multiple times most weeks.

89.    Among other declines in the quality and variety of the food, Mr. Johnson stopped being provided meat in any recognizable form and instead almost always received turkey pellets or ultra-processed patties made from an indiscernible meat. Similarly, rather than fresh vegetables, the vegetables provided were canned items such as carrots, green beans, and corn or otherwise so poorly prepared they lost flavor and were mushy, like overcooked broccoli stems.

90.    Several years ago, Mr. Johnson heard an Aramark worker state that he would cut the ingredients for daily meals services as much as possible in order to get a bonus from Aramark.

91.    Because of the decline in the quality and quantity of the food provided as part of the free daily meal services, Mr. Johnson relied on food he purchased from the commissary operated by Aramark.

92.    Like many people incarcerated at Mt. Olive, in any given month, Mr. Johnson spent nearly his entire monthly paycheck of $68 on food from the commissary.

93.    Mr. Johnson occasionally purchased an item from Fresh Favorites, but like all incarcerated consumers who rely on their paychecks to purchase supplemental food, limited funds made it hard to purchase these significantly more expensive items with regularity.

### d.    Plaintiff Sandra Rush

94.    Plaintiff Sandra Rush has a son, Matthew Flint, who has been incarcerated at Mt. Olive since May 9, 2024.

95.    Ms. Rush sends iCare packages to her son to supplement the food he receives at Mt. Olive. Her son struggles to eat the food provided at Mt. Olive because of its poor quality, and has told Ms. Rush that it is bland, tasteless, and contains no fresh vegetables.

96.    Shortly after his incarceration at Mt. Olive, Ms. Rush learned about the iCare program through her son.

97.    At her son's request, Ms. Rush has purchased food for him through iCare, which has items containing ingredients that are not provided in the mandated daily food services, such as beef and cheese contained in the steak and cheese sandwiches and pizza, and chicken items such as chicken wings.

98.    Ms. Rush purchases these items for her son through a website where she is able to select certain items for him from a list of available options.

99.    The iCare prices are higher than what Ms. Rush would pay for similar items in a grocery store or even a restaurant.

100.    Ms. Rush receives reminder emails from Aramark's iCare website encouraging her to purchase food for her son with advertisements that associate love and staying connected with buying "fresh," "tasty," "delicious," and "flavorful" food. For example, Aramark's iCare website includes the following images:



21



22

101.     The emails contain convenient links for purchasing Fresh Favorites and have

prompted Ms. Rush purchase more food from iCare.

102.     Despite being on a fixed income, Ms. Rush prioritizes spending money on iCare

packages for her son at Mt. Olive because she knows that he is not receiving adequate daily

meals services.

103.     Since her son's incarceration at Mt. Olive, Ms. Rush has spent approximately

$400 on iCare products for her son.

104.     In order to pay for the iCare food, Ms. Rush has reduced spending on her own

groceries and other essentials such as cleaning supplies.

---

[21] *Mount Olive*, iCare, https://www.icaregifts.com/MountOliveCorrectionalComplexWV.html
[https://perma.cc/Z62E-8SWM] (last visited Nov. 4, 2025).
[22] *Fresh Food / Chicken Caesar Salad*, iCare, https://www.icaregifts.com/fresh-
food?prefn1=facilities&prefn2=refinementCategory&prefv1=all%7CMountOliveCorrectionalCo
mplexWV&prefv2=Salads&start=0&sz=24 [https://perma.cc/6FRK-482F] (last visited Dec. 1,
2025).

### e.    Plaintiff Judy Riggs

105.    Plaintiff Judy Riggs had a brother, Hubert Riggs, who was incarcerated at Mt. Olive for approximately 7 years before he passed away in July 2025.

106.    For several years before her brother passed, Ms. Riggs purchased food through Aramark's commissary for her brother. She currently has a friend incarcerated at Mt. Olive for whom she continues to purchase commissary care packages.

107.    Ms. Riggs purchased food for her brother and continues to purchase food for her friend because they have told her that they do not get enough food to eat, and the food is not good.

108.    Ms. Riggs receives marketing emails for iCare from Aramark several times a month and has purchased them for her brother and friend on special occasions.

109.    Ms. Riggs approximates that since 2022, she has purchased over $4,000 worth of food from Aramark's food-for-purchase programs.

## V.    CLASS ALLEGATIONS

110.    Plaintiffs incorporate the preceding paragraphs by reference.

111.    This case is brought as a class action pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2)–(3) on behalf of a class consisting of all people who purchased food products from commissary, Fresh Favorites, and/or iCare for themselves or loved ones who have been incarcerated at Mount Olive Correctional Complex after Aramark Corporation acquired Union Supply. The class includes three subclasses: (1) people who were formerly incarcerated at Mt. Olive (the "formerly incarcerated at Mt. Olive consumer" subclass), (2) people who are currently incarcerated at Mt. Olive (the "currently incarcerated consumer" subclass), and (3) people who

have used iCare or commissary to send food to loved ones incarcerated at Mt. Olive (the "loved ones consumer" subclass).

112.    Plaintiffs Roger D. Smith and Marcus P. McKinley represent and are members of the class and the currently incarcerated consumer subclass.

113.    Plaintiff William R. Johnson represents and is a member of the class and the formerly incarcerated at Mt. Olive consumer subclass.

114.    Plaintiffs Sandra Rush and Judy Riggs represent and are members of the class and the loved ones consumer subclass.

115.    Excluded from the class are Defendants, and any entities in which Defendants have an interest, the Defendants' employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

116.    The classes meet the criteria for certification under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3). Plaintiffs and all members of the class and subclasses have been harmed by the acts of the Defendants. Class-wide adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

117.    In addition, the currently incarcerated and loved ones consumer subclasses meet the criteria for certification under Fed. R. Civ. P. 23(b)(2) because they have been and continue to be harmed by the acts of the Defendants.

118.    **Numerosity: Fed. R. Civ. P. 23(a)(1):** Plaintiffs do not know the exact size or identities of the members of the proposed classes, since such information is in the exclusive control of Defendants. However, Mt. Olive has a capacity of 1,030 incarcerated people and had

an average daily population of 967 incarcerated people in 2024.[23] Hundreds of putative class members have been and continue to be subjected to Aramark's food services scheme daily.

119.    **Ascertainability:** The exact number of class members impacted can readily be determined from the internal business records of the Defendants, which will show the individuals who made food purchases from commissary, Fresh Favorites, and iCare. In addition, class members may be ascertained through notification of the pendency of this action through publication at Mt. Olive, among other means, including Defendants' email marketing lists.

120.    **Commonality and Predominance: Fed. R. Civ. P. 23(a)(2) and (b)(3):** All members of the classes have been subjected to and affected by the same conduct. Their claims are based on a uniform scheme being carried out by a single company, Aramark. Aramark's challenged conduct can be measured by comparing it to objective criteria, such as the requirements of Aramark's contract with the West Virginia Division of Corrections and Rehabilitation as a measure of its improper daily meals service and by records of its food-for-purchase profits. Common questions of law and fact affect the class members and predominate over individual issues, including, without limitation:

> a.    Whether Aramark is engaging in a scheme in which it fails to provide people incarcerated at Mt. Olive with adequate free daily meals services, which drives them to purchase commissary food or meals from Aramark's Fresh Favorites program and drives their loved ones and family members

---

[23] *Mount Olive Correctional Complex*, WV Division of Corrections & Rehabilitation, https://dcr.wv.gov/facilities/Pages/prisons-and-jails/moccj.aspx [https://perma.cc/J3PW-SZDK] (last visited Nov. 4, 2025). *See also Annual Report FY2024*, WV Division of Corrections & Rehabilitation, https://dcr.wv.gov/resources/SiteAssets/Pages/publications/Pub_AnnualReport_FY2024_DHS_DCR.pdf [https://perma.cc/8WZ2-QSPF] (last visited Nov. 24, 2025).

to purchase food from commissary or iCare;

b.      Whether Aramark's conduct is unfair, in violation of the West Virginia

Consumer Credit and Protection Act, W. Va. Code §§46A-6-101, *et seq*.;

c.      Whether Aramark receives money from people incarcerated at Mt. Olive

and their loved ones under circumstances that make it inequitable for

Aramark to retain this benefit;

d.      Whether Aramark engages in coercive conduct that places people

incarcerated at Mt. Olive and their loved ones in a position of economic

duress;

e.      Whether Plaintiffs and the classes are injured by Aramark's conduct;

f.      The type and measure of damages suffered by Plaintiffs and the classes.

121.    **Typicality: Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of the claims

of the classes. Plaintiffs and members of the classes are all people who have been injured by

Aramark's food services scheme, who purchased food from Aramark, and whose injuries arise

out of Aramark's common course of conduct in violation of the West Virginia Consumer Credit

and Protection Act and related laws.

122.    Plaintiffs Roger D. Smith, Marcus P. McKinley, and William R. Johnson and

members of the formerly and currently incarcerated at Mt. Olive consumer subclasses have been

incarcerated at Mt. Olive after Aramark Corporation acquired Union Supply in 2022 and have

been subject to Aramark's food services scheme.

123.    Plaintiffs Sandra Rush and Judy Riggs are members of the loved ones subclass.

Since Aramark Corporation acquired Union Supply in 2022, they have purchased food from

Aramark's iCare and commissary care package programs to provide to their loved ones because of Aramark's food services scheme.

124.    There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the classes, and the relief sought is common to the classes.

125.    **Adequacy of Representation: Fed. R. Civ. P. 23(a)(4):** Plaintiffs will fairly and adequately protect the interests of the members of the classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes, and Plaintiffs have retained counsel competent and experienced in the prosecution of consumer class actions to represent themselves and the classes.

126.    **Fed. R. Civ. P. 23(b)(2):** Defendants have acted and continue to act on grounds generally applicable to the currently incarcerated consumer subclass and the loved ones subclass by virtue of a common scheme, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the classes as a whole.

127.    **Superiority: Fed. R. Civ. P. 23(b)(3):** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive.

## VI.    CAUSES OF ACTION

### COUNT I

**Unfair Acts and Practices in Violation of the**
**West Virginia Consumer Credit and Protection Act**
**W.Va. Code §§ 46A-6-101, *et seq.***

128.    Plaintiffs incorporate the preceding paragraphs by reference.

129.    The WVCCPA prohibits, among other things, unfair acts or practices in the conduct of any trade or commerce. W. Va. Code § 46A-6-104. The WVCCPA "shall be liberally construed so that its beneficial purposes may be served." W. Va. Code § 46A-6-101(1).

130.    Under W. Va. Code § 46A-6-102(2) of the WVCCPA: "'Consumer' means a natural person to whom a sale or lease is made in a consumer transaction and a 'consumer transaction' means a sale or lease to a natural person or persons for personal, family, household or agricultural purpose." Plaintiffs and the class they seek to represent are natural persons and "consumers" under this statute. Their food purchases from commissary, Fresh Favorites and iCare are "consumer transactions" for personal use.

131.    Under W. Va. Code § 46A-6-102(6) of the WVCCPA: "'Trade' or 'commerce' means the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state." Aramark is engaging in trade or commerce when it offers food for sale to incarcerated people and their loved ones through its commissary, Fresh Favorites and iCare food-for-purchase programs.

132.    W. Va. Code § 46A-6-102(7) of the WVCCPA contains a non-exhaustive list of unfair or deceptive acts or practices.

133.    While the WVCCPA does not expressly define what constitutes an "unfair act," it complements the body of federal law governing unfair acts or practices. W. Va. Code § 46A-6-

101(1) ("The Legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition."). In construing the WVCCPA, courts are guided by section 5(a)(1) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45(a)(1), and the various other federal statutes addressing unfairness. W. Va. Code § 46A-6-101(1).

134.    Section 5(a)(1) of the FTC Act prohibits unfair or deceptive acts or practices. 15 U.S.C. § 45(a)(1). An act or practice is unfair when it (1) causes or is likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) that injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. at § 45(n). The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), another federal consumer protection statute governing unfair acts or practices, articulates the same criteria. 12 U.S.C. §§ 5531(c)(1)–(2).

135.    Aramark's scheme has and continues to substantially injure Plaintiffs and the classes they seek to represent because it is causing monetary harm; they are paying for food because of Aramark's failure to provide adequate free daily meals services. Aramark's conduct is acutely oppressive and unscrupulous because it is using a commodity essential for survival as a tool to extort profits off a captive market that cannot reasonably avoid obtaining food provisions because they are exclusively controlled by Aramark. Aramark knows that ensuring adequate daily meals services is essential to the health, safety, and overall welfare of people incarcerated at Mt. Olive.

136.    Aramark's scheme provides no countervailing benefits to consumers or competition. To the contrary, Aramark's scheme eliminates competition because it obtained

exclusive control over food provision at Mt. Olive. Aramark is not only harming incarcerated consumers and their family members and loved ones, but also misusing taxpayer dollars and harming the State of West Virginia by grossly failing to meet even the minimum standards set forth in its contract with West Virginia and the established public policy in West Virginia and is creating unwarranted health and safety risks to Plaintiffs, the class, and the staff at Mt. Olive.

137.    Aramark is exploiting its position of exclusive control over the food provisions at Mt. Olive and unreasonably taking advantage of the obstacle Plaintiffs and the classes face: they have no choice but to purchase food from Aramark. They also have no choice over the prices they pay for food available through Aramark's commissary, including care packages purchased by loved ones through commissary, Fresh Favorites, and iCare programs.

138.    Aramark's conduct also violates generally recognized standards of business ethics, which can be measured against Aramark's own statements about the importance of proper food services in prisons and the promises it made to appropriately provide food services consistent with objective criteria contained in Aramark's contract with West Virginia.

139.    Aramark knows that its food services are improper because it receives grievances relating to food quantity and quality from incarcerated people, and internal reviews show Aramark's food services are systemically inconsistent with their contractual and legal obligations. In addition, Aramark Corporation's failure to provide adequate daily meals services has been widely publicized, and it has lost contracts with prison facilities in other states.

140.    Aramark's food services policy and practice results in unjust profits for Aramark generated from consumers who have no choice or bargaining power.

141.    Plaintiffs and the classes they seek to represent have incurred actual out-of-pocket losses that were proximately caused by Aramark's conduct; they have purchased and continue to

purchase food from the commissary, Fresh Favorites, and iCare because Aramark's daily meals services are inadequate. *See* W. Va. Code § 46A-6-106(A).

## COUNT II

### Common Law Economic Duress

142.    Plaintiffs incorporate the preceding paragraphs by reference.

143.    Economic duress occurs when a party is forced into a transaction as a result of unlawful threats or wrongful, oppressive, or unconscionable conduct, which leaves the party no reasonable alternative but to acquiesce.

144.    Aramark is putting Plaintiffs and the classes in a position of economic duress because its scheme forces class members to purchase food from Aramark in order to meet their own and their loved ones' basic needs. Because Aramark maintains exclusive control over all food services for people incarcerated at Mt. Olive, class members are provided no other alternative. These circumstances are the result of the coercive acts of Aramark.

145.    Aramark has superior economic power because Plaintiffs and the classes they seek to represent cannot obtain food for people incarcerated at Mt. Olive except through Aramark. People incarcerated at Mt. Olive are not allowed to buy food from another vendor or receive food directly from friends or family. Furthermore, Aramark Corporation is a multibillion-dollar, Fortune 500 company, whereas Plaintiffs and the class are captive consumers, and members of the incarcerated consumer subclass have no ability to earn meaningful wages while incarcerated. Aramark has a duty to use its superior economic position reasonably.

146.    Aramark has used this power unlawfully, oppressively, and unreasonably by effectuating its food services scheme.

147.    Plaintiffs and the classes have no reasonable recourse other than to be subjected to Aramark's food services scheme and, as such, their damages were proximately caused by Aramark's conduct.

148.    Plaintiffs and the classes have been damaged and continue to be damaged by Aramark's unlawful conduct. They have incurred actual out-of-pocket losses by purchasing food that people incarcerated at Mt. Olive should have received for free, and they continue to incur these losses.

## COUNT III

### Common Law Unjust Enrichment

149.    Plaintiffs incorporate the preceding paragraphs by reference.

150.    Unjust enrichment occurs when there is: (1) a benefit conferred upon the defendant, (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

151.    Plaintiffs and the classes they seek to represent conferred a benefit on Aramark in the form of money they paid and continue to pay to Aramark because of Aramark's unfair food services scheme. Aramark also receives a monetary benefit by saving costs on its daily meals services by limiting the quality, quantity, and variety of the food.

152.    Aramark knows that it receives money from Plaintiffs and the classes for food they bought and continue to buy through Aramark's food-for-purchase programs. Aramark also knows that it saves money and therefore boosts its profits by providing less and poor-quality food for daily meals services.

153.    Aramark has accepted and continues to accept these monetary benefits under circumstances that make it inequitable for Aramark to retain them by virtue of its food services scheme. In addition, Aramark has used and continues to use a commodity essential for survival—namely, food—as a tool to extract profits off a captive market that has no choice but to obtain food provisions exclusively controlled by Aramark.

154.    Aramark has been unjustly enriched by these payments illegally and wrongly collected from Plaintiffs and the classes through its food-for-purchase programs. Aramark has also been unjustly enriched by the costs it was able to illegally and wrongly save by failing to provide an adequate quantity and quality of food for daily meal services.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Roger Smith, Marcus McKinley, William Johnson, Sandra Rush and Judy Riggs pray that this Court grant the following relief:

a.    Certify this action as a class action on behalf of the putative classes pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2)–(3), appoint Plaintiffs as representatives of their respective classes, and appoint the undersigned as class counsel;

b.    Enter a declaratory judgment that Defendants' scheme is unfair under W. Va. Code § 46A-6-106(a);

c.    Enter a declaratory judgment that Defendants' conduct is intentional, wrongful, oppressive and/or unconscionable, causing Plaintiffs and the classes economic duress;

d.    Enjoin Defendants' unlawful scheme;

e.    Order disgorgement and restitution of Defendants' unlawful profits;

f.   Award Plaintiffs and the classes actual or statutory damages, whichever is greater, as appropriate;

g.   Award Plaintiffs and the classes punitive damages, as appropriate;

h.   Award Plaintiffs' costs and reasonable attorneys' fees as allowed by law; and

i.   Such other relief as the Court deems equitable and just.

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated December 1, 2025                          Respectfully submitted,

                                                /s/*Lydia C. Milnes*
                                                Lydia C. Milnes (WV Bar No. 10598)
                                                Lesley M. Nash (WV Bar No. 14158)
                                                Mountain State Justice, Inc.
                                                1029 University Ave., Suite 101
                                                Morgantown, WV 26505
                                                p. 304.326.0188
                                                f. 304.326.2040
                                                lydia@msjlaw.org
                                                lesley@msjlaw.org

                                                Shennan Kavanagh (MA BBO # 655174)*
                                                Jennifer Wagner (WV Bar No. 10639)
                                                Caroline Cohn (MA BBO # 711850)*
                                                National Consumer Law Center
                                                7 Winthrop Square, 4th Floor
                                                Boston, MA 02110
                                                p. 617.542.8010
                                                f. 617.542.8028
                                                skavanagh@nclc.org
                                                jwagner@nclc.org
                                                ccohn@nclc.org

                                                Rebecca Livengood (D.C. Bar No. 674010)*
                                                Stephen Hayes (D.C. Bar No. 1010531)*
                                                Edward Olds (D.C. Bar No. 90004730)*
                                                Relman Colfax PLLC
                                                1225 19th Street, N.W., Suite 600
                                                Washington, D.C. 20036
                                                p. 202.728.1888

f. 202.728.0848
rlivengood@relmanlaw.com
shayes@relmanlaw.com
tolds@relmanlaw.com

\* *Pro hac vice* applications forthcoming


*Counsel for Plaintiffs*