**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| ROGER D. SMITH, MARCUS P. MCKINLEY, WILLIAM R. JOHNSON, SANDRA RUSH and JUDY RIGGs, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>ARAMARK CORPORATION, ARAMARK CORRECTIONAL SERVICES, LLC, and UNION SUPPLY GROUP,<br><br>*Defendants.* | Civil Action No. 2:25-cv-00710<br>District Judge: Thomas E. Johnston<br>Magistrate Judge: Dwane L. Tinsley |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

ARGUMENT ........ 5

I. PLAINTIFFS STATE A CLAIM UNDER THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (WVCCPA). ........ 6

A. The WVCCPA prohibits unfair conduct in trade or commerce. ........ 7

B. Defendants are engaged in trade or commerce with Plaintiffs. ........ 8

C. Plaintiffs adequately allege that Defendants engage in an unfair food services scheme. 9

i. Aramark's food services scheme causes or is likely to cause substantial injury to Plaintiffs and the class. ........ 9

ii. Plaintiffs have adequately alleged that they cannot reasonably avoid purchasing food from Aramark. ........ 12

iii. Plaintiffs' injury is not outweighed by countervailing benefits to consumers or to competition. ........ 14

D. Defendants' arguments about claims Plaintiffs have not pled are irrelevant. ........ 15

II. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CLAIM FOR ECONOMIC DURESS. ........ 16

III. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CLAIM FOR UNJUST ENRICHMENT. ........ 17

IV. THE INCARCERATED PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THEY HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES. ........ 17

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Adkins v. Wells Fargo Bank, N.A.*,
434 F. Supp. 3d 419 (S.D. W. Va. 2020)....................5, 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................6

*Barr v. NCB Mgmt. Servs., Inc.*,
711 S.E.2d 577 (W. Va. 2011)....................6, 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................6

*Bragg v. WV Dep't of Corr. & Rehab.*,
No. CV 2:20-00577, 2023 WL 2979028 (S.D. W. Va. Mar. 20, 2023)....................18

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013)....................15

*Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)....................10

*Custis v. Davis*,
851 F.3d 358 (4th Cir. 2017)....................18

*Dunlap v. Hinkle*,
317 S.E.2d 508 (W. Va. 1984)....................17

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999)....................5

*Ellibee v. Aramark Corr. Servs., Inc.*,
154 P. 3d 39 (Kan. Ct. App. 2007)....................9

*FTC v. Wyndham Worldwide Corp.*,
10 F. Supp. 3d 602 (D.N.J. 2014)....................14

*FTC v. Direct Mktg. Concepts, Inc.*,
569 F. Supp. 2d 285 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010)....................10

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010)....................12

*FTC v. RCG Advances, LLC*,
695 F. Supp. 3d 368 (S.D.N.Y. 2023)....................13

*FTC v. Walmart Inc.*,
664 F. Supp. 3d 808 (N.D. Ill. 2023) ........................................................................12

*Greenberg v. Amazon.com, Inc.*,
553 P.3d 626 (Wa. 2024) ........................................................................13, 14, 15

*Griffin v. Arpaio*,
557 F.3d 1117 (9th Cir. 2009) ........................................................................19

*Insco v. Wexford Health Sources, Inc.*,
No. 2:19-CV-00612, 2020 WL 2770419 (S.D. W. Va. May 28, 2020)............................19, 20

*In the Matter of Int'l Harvester Co.*,
104 F.T.C. 949, 1984 WL 565290 (Dec. 21, 1984)................................................12

*Jones v. Bock*,
549 U.S. 199 (2007)........................................................................18, 19

*Lowe v. Johnson*
No. 2:17-CV-02345, 2018 WL 4222829 (S.D. W. Va. Aug. 13, 2018).................................20

*Mach. Hauling, Inc. v. Steel of W. Va.*,
384 S.E.2d 139 (W. Va. 1989)........................................................................16

*Panetta v. Chesapeake Energy Corp.*,
No. 2:10–cv–00278, 2010 WL 1930160 (S.D. W. Va. May 12, 2010)............................16, 17

*Potts v. W. Virginia Univ. Bd. of Governors*,
No. 2:23-CV-00738, 2024 WL 3378935 (S.D. W. Va. July 11, 2024)....................................5

*Realmark Devs., Inc. v. Ranson*,
542 S.E. 2d 880 (W. Va. 2000)........................................................................17

*Reid v. Unilever U.S., Inc.*,
964 F. Supp. 2d 893(N.D. Ill. 2013) ........................................................................15, 16

*Sand v. Milwaukee Cnty. House of Corr.*,
No. 19-C-348, 2022 WL 912283 (E.D. Wis. Mar. 29, 2022)...................................................9

*Smith v. Collection Techs., Inc.*,
No. 2:15-cv-06816, 2016 WL 1169529 (S.D. W. Va. Mar. 22, 2016).....................................7

*In re: Social Media Adolescent Addiction*,
777 F. Supp. 3d 1016 (N.D. Cal. 2025) ........................................................................14

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ........................................................................15

*Strong v. David*,
297 F.3d 646 (7th Cir. 2002) ....................19

*Thorpe v. Clarke*,
37 F. 4th 926 (4th Cir. 2022) ....................5

*Wasanyi v. Aramark Servs., Inc.*,
No. 2:23-CV-00575, 2024 WL 4472357 (S.D. W. Va. July 2, 2024) ....................19, 20

*West Virginia Transp. Co. v. Sweetzer*,
25 W. Va. 434 (W. Va. 1885) ....................16

*Wilcox v. Brown*,
877 F.3d 161 (4th Cir. 2017) ....................18, 19

*Wilson v. MRO Corp.*,
No. CV 2:16-5279, 2017 WL 2608541 (S.D. W. Va. June 15, 2017) ....................8

*Woodard v. Victory Records*,
No. 1:11-cv-07594, 2016 WL 1270423 (N.D. Ill. Mar. 31, 2016) ....................16

**Statutes**

12 U.S.C. §§ 5531(c)(1)–(2) ....................7

15 U.S.C. § 45 ....................7

Rev. Code Wa. 19.86.010, *et seq*. ....................13

W. Va. Fresh Food Act, W. Va. Code § 7-8-2a(a) ....................11

West Virginia Prison Litigation Reform Act, W. Va. Code § 25-1A-2 ....................17, 19

WVCCPA, W. Va. Code § 46A-6-101, *et seq*. .................... *passim*

**Other Authorities**

§ *1357 Motions to Dismiss-Practice Under Rule 12(b)(6)*, 5B Fed. Prac. & Proc.
Civ. § 1357 (4th ed.) ....................18

## INTRODUCTION

Plaintiffs and the class are incarcerated consumers and their loved ones who have no choice but to obtain food provided from a single company, Aramark. Aramark is a massive multi-national food services provider company in a position of power over this particularly disadvantaged population; it has exclusive control of a basic necessity for this captive market. Plaintiffs plausibly allege that Aramark uses its position of control unfairly to profit off them.

Aramark's scheme is simple: it saves money by limiting the quantity, quality and variety of foods in its mandatory free daily meals services while extracting surplus profits by promoting its food-for-purchase options to drive people incarcerated at Mt. Olive and their loved ones to purchase food that should be provided for free. *E.g.,* Compl., Dkt. 1, ¶ 4. Aramark does this by systematically cutting corners in its daily meals services, including using less than required amounts of ingredients for meals, augmenting meals with fillers, substituting processed foods for fresh ones, reusing leftover food, and reducing food variety and freshness. *E.g., id*. ¶ 4, 6, 40. Aramark's contract with West Virginia and its menus provided to incarcerated consumers contain standards for free daily meals, and Aramark does not meet these standards. *Id*. ¶ 5, 51–54. Indeed, Aramark has a national reputation of failing to provide the required daily meals services that it gets paid by states to provide their prison systems, and it is no different in Mt. Olive. *Id*., ¶ 42, 45–50. The result of Aramark's practice is that its daily meals do not serve their intended purpose—to provide sufficient nourishment independent from the food it charges money for.

Aramark uses its food-for-purchase programs as a substitute for its promise to provide adequate free daily meals. These programs—commissary, Fresh Favorites, and iCare packages—offer many foods that are supposed to be provided in the free daily meals services, including whole meats and fresh vegetables. Aramark promotes these food-for-purchase options using

descriptors like fresh and flavorful—some of the very characteristics of the food it is required to provide in its free daily meals services but does not. Food is a basic necessity, and further, as Aramark says in its advertisements, having a variety of fresh and flavorful foods "boosts morale" and can help "break the cycle of recidivism."

Aramark has created circumstances at Mt. Olive that set the stage for its unfair conduct. Longstanding fundamental principles of marketplace fairness embedded in the West Virginia Consumer Credit and Protection Act and common law are based on consumer choice and seek to prevent the unfairness and exploitation that can occur when powerful companies have exclusive control over captive markets. These laws apply equally to incarcerated consumers.

Inevitably, and certainly plausibly, Aramark's scheme drives incarcerated consumers and their loved ones to buy food from Aramark, using their limited means that could be used for other necessities, including savings for reentry. Aramark unlawfully profits off this scheme.

## **STATEMENT OF FACTS**

Plaintiffs are people incarcerated at Mount Olive Correctional Complex (Mt. Olive) and their loved ones, who purchased food from Aramark because Aramark failed to provide adequate free daily meals. *See generally* Compl. Aramark is a "multi-billion-dollar, Fortune 500 company," and is "the largest provider of food services to prisons and jails in the United States." *Id.* ¶ 27.

All food available to people incarcerated at Mt. Olive is exclusively controlled by Aramark. Since 2019, Aramark has had a contract to provide the daily meal service to all individuals incarcerated in West Virginia. *Id.* ¶ 52. Aramark's contract requires it to provide appetizing, nutritious, fresh, and varied food to individuals incarcerated at Mt. Olive. *Id.* ¶¶ 53–54. In addition to the free daily meals service, incarcerated consumers may buy food

through the commissary, "a retail store in which incarcerated consumers can purchase food and drinks," run at Mt. Olive by Defendant Union Supply. *Id.* ¶¶ 28, 33. Aramark acquired Union Supply in 2022, *id.* ¶ 29, gaining "exclusive control over food provisions at . . . Mt. Olive." *Id.* ¶ 30.[1] Aramark also sells food through its "Fresh Favorites" program, which allows incarcerated consumers to purchase food items including "fruit-flavored yogurts, fresh vegetable trays, fried chicken, BLT sandwiches, and baked potatoes." *Id.* ¶ 34.

People incarcerated at Mt. Olive cannot receive food directly from loved ones. *Id.* ¶ 4. Rather, their loved ones can send food to Mt. Olive only through Aramark's "iCare" product, *id.* ¶ 35, which Aramark markets with advertisements that associate love and staying connected with buying "fresh," "tasty," "delicious," and "flavorful" food. *Id.* ¶¶ 97–100.

Despite promising the state of West Virginia to provide nutritious and appetizing food for incarcerated people and using marketing campaigns that center on these themes, Aramark fails to provide adequate food through the daily meals service. Aramark consistently removes or reduces the quantity and quality of the ingredients used to prepare the free meals. *Id.* ¶¶ 69, 78, 80, 88–90. For example, "if a meal calls for 20 pounds of meat," Aramark supplies only "12 pounds of meat to add to the meal." *Id.* ¶ 78. Aramark staff have stated that they receive bonuses for "cut[ting] ingredients for daily meals services as much as possible." *Id.* ¶ 90. Aramark's employees save money on daily meals services by using "less food, limiting the variety of food, substituting cheaper processed food for fresh food, [and] reusing leftovers that should be discarded due to being past their expiration date or spoiled." *Id.* ¶ 6. As a result, the kitchen at Mt. Olive frequently runs out of the food listed on the daily menu and supplements with leftovers

---

[1] Defendants in this case are Aramark Corporation, Aramark Correctional Services, LLC, and Union Supply Group. Plaintiffs refer to them collectively here as "Aramark."

and poor-quality ingredients. *Id.* ¶ 88.

Plaintiffs' experiences detail the inadequacy of Aramark's free daily meals. Plaintiff Smith witnessed kitchen workers picking bugs out of gravy that was then served as part of the daily meals. *Id.* ¶ 73. Plaintiffs and others incarcerated at Mt. Olive remain hungry after eating the daily meals Aramark provides, *id.* ¶ 80, and they have filed numerous grievances about the quantity and quality of the food Aramark provides through its daily meals services. *Id.* ¶ 5, 42. As a result, the poor quality of Aramark's free meals is the number one complaint made by incarcerated individuals at Mt. Olive. *Id.* ¶ 77.

While at Mt. Olive, each incarcerated Plaintiff has experienced a decline in the quality, quantity, and variety of free daily meals. *Id.* ¶¶ 65–69, 79–80, 86–89. Free daily meals at the facility previously included fresh vegetables, unprocessed meats, and real dairy and eggs; those are now replaced with small quantities of ultra-processed, flavorless food. *See id.*

Plaintiffs' experiences at Mt. Olive are corroborated by the multiple independent accounts describing the shockingly poor quality of food Aramark provides in carceral facilities throughout West Virginia and across the nation. *See generally id.* ¶¶ 39–50. For example, a class-action lawsuit alleged that, pursuant to Aramark's contract with West Virginia, it served spoiled milk and rotten or undercooked meat to incarcerated individuals in the state. *Id.* ¶ 43 & n.12. Widespread reporting shows that Plaintiffs' experiences at Mt. Olive are typical of Aramark's business model. In correctional facilities throughout the country, Aramark serves incarcerated individuals inadequate food, including food that is spoiled or infested with maggots and rodent, insect, and bird droppings. *See id.* ¶¶ 46–49.

Faced with inadequate, bland, spoiled, and non-nutritious food, people incarcerated at Mt. Olive—using their own money, and through gifts of Aramark food from their loved ones on the

outside—are forced to supplement their diet through the Aramark-run commissary, Fresh Favorites, and iCare. *Id.* ¶¶ 25, 70, 80–81, 91, 95, 102, 107. Plaintiff Smith spends approximately $40–$50 per month on food from the commissary, *id.* ¶¶ 71–72, but he is still unable to afford healthy items such as fresh vegetables. *Id.* ¶ 73. Plaintiff McKinley spends $50–$60 a month on food, comprising up to 85% of his total monthly income of $70. *Id.* ¶¶ 81–82. Plaintiff Johnson also frequently spent nearly his entire monthly paycheck on food from the commissary; Mr. Johnson also occasionally purchased items from Fresh Favorites, but he struggled to afford these items on his limited income. *Id.* ¶¶ 91–93. Plaintiff Rush has spent over $400 on meals from iCare for her incarcerated son because she knows he is not receiving adequate daily meals. *Id.* ¶¶ 102–103. Ms. Rush has reduced spending on her own groceries and other essentials to purchase food through iCare that is more expensive than similar items purchased through a grocery store or restaurant. *Id.* ¶¶ 99, 104. Finally, Plaintiff Riggs estimates that "she has purchased over $4,000 worth of food from Aramark's food-for-purchase programs" since 2022 for her brother, who was incarcerated at Mt. Olive before his passing, and her friend who remains incarcerated there. *Id.* ¶¶ 106, 109. Ms. Riggs purchased food for her brother and her friend because "they told her that they do not get enough food to eat" at Mt. Olive. *Id.* ¶ 107.

## ARGUMENT

At motion to dismiss stage, the Court must "take all Plaintiffs' allegations as true," *Thorpe v. Clarke*, 37 F. 4th 926, 931 (4th Cir. 2022), and must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Adkins v. Wells Fargo Bank, N.A.*, 434 F. Supp. 3d 419, 423 (S.D. W. Va. 2020) (Johnston, J.) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). A complaint survives a motion to dismiss if it alleges sufficient facts to move the "claims across the line from conceivable to plausible." *Potts v. W. Virginia Univ. Bd. of Governors*, No. 2:23-CV-00738, 2024 WL 3378935, at *2 (S.D. W. Va. July 11,

2024) (Johnston, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim meets the plausibility standard when the plaintiff pleads factual allegations "that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adkins*, 434 F. Supp. 3d at 423 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I. PLAINTIFFS STATE A CLAIM UNDER THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (WVCCPA).

Plaintiffs have plausibly alleged that Defendants are engaging in an unfair food services scheme that violates the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101(1) (WVCCPA). This scheme consists of three components: (1) obtaining exclusive control over all of the food provisions available to incarcerated people by acquiring the commissary business of Union Supply, (2) maintaining an inadequate quality, quantity, and variety of food in its mandated daily meals services that it is required to provide to people incarcerated at Mt. Olive, and (3) developing and promoting more food-for-purchase programs such as Fresh Favorites and iCare. Compl. ¶ 24.

The WVCCPA prohibits unfair acts or practices in the conduct of any trade or commerce. W. Va. Code § 46A-6-104. The West Virginia Legislature has further made clear that it intends for the WVCCPA to be "liberally construed so that its beneficial purposes may be served." W. Va. Code § 46A-6-101(1). *See also Barr v. NCB Mgmt. Servs., Inc.*, 711 S.E.2d 577, 583 (W. Va. 2011) (WVCCPA is a "remedial" statute that courts construe "liberally so as to furnish and accomplish all the purposes intended.") (internal quotation marks omitted).

The West Virginia legislature has expressly directed courts to interpret the statute in light of the Federal Trade Commission's interpretation of the FTC Act. *Id.* § 46A-6-101(1) ("It is the intent of the Legislature that, in construing this article, the courts be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the

federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U. S. C. § 45(a)(1))"); *see also id.* § 46A-6-103.

Section 5(a)(1) of the FTC Act defines an unfair practice as one that: (1) causes or is likely to cause substantial injury to consumers; (2) where that injury is not reasonably avoidable by consumers; and (3) where that injury is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n); *see also* 12 U.S.C. §§ 5531(c)(1)–(2) (adopting the same criteria for similar statute). These are thus the three elements of an unfairness claim under the WVCCPA. Plaintiffs have alleged each element of their WVCCPA claim against Defendants. None of Defendants' arguments to the contrary—that the WVCCPA does not prohibit unfair practices other than the deceptive practices it outlines; that the Plaintiffs cannot maintain a consumer protection claim where the scheme includes provision of free food; that Plaintiffs could have reasonably avoided the injury; or that Plaintiffs cannot sustain claims they did not bring—avails.

### A. The WVCCPA prohibits unfair conduct in trade or commerce.

Defendants' interpretation of the WVCCPA—that it prohibits only a delineated list of deceptive practices, *see* Def. Mot. to Dismiss at 12–13—is contrary to the express statutory language and intent, and this Court has previously rejected precisely this argument. In *Smith v. Collection Techs., Inc.*, the defendant argued the plaintiff's WVCCPA claim should fail because "none of the facts alleged by Plaintiff reasonably fit with any of the examples of prohibited conduct." No. 2:15-cv-06816, 2016 WL 1169529, at *10 (S.D. W. Va. Mar. 22, 2016). The Court found that argument "unconvincing," because the WVCCPA "makes clear that the statutory list providing examples of conduct prohibited by § 104 is not exhaustive." *Id.* (citing W. Va. Code § 46A-6-102(7)) ("'Unfair methods of competition and unfair or deceptive acts or practices' means

and includes, but is not limited to . . . the following [items][.]" (brackets in original)).

**B. Defendants are engaged in trade or commerce with Plaintiffs.**

Defendants are engaged in trade or commerce with Plaintiffs. The WVCCPA prohibits unfair acts or practices "in the conduct of any trade or commerce." W.Va. Code § 46A-6-104. And it provides a private right of action for "any person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property" as a result of an unfair practice. W.Va. Code § 46A-6-106(a); *see also Wilson v. MRO Corp.*, No. CV 2:16-5279, 2017 WL 2608541, at *6–7 (S.D. W. Va. June 15, 2017) (rejecting overly crabbed reading of transactions covered by the WVCCPA).

Plaintiffs are all natural persons who have purchased food from Defendants' food-for-purchase programs such as commissary, Fresh Favorites and iCare, for personal or family use. As a result of engaging in this sale/purchase transaction, Plaintiffs are consumers and are therefore engaging in consumer transactions with Defendants. Aramark explains on its website that its commissaries "treat inmates like consumers." Compl., ¶ 33. It further describes its Fresh Favorites program as a "retail experience" where incarcerated consumers can buy "special meals" using their own money. *Id.* ¶ 34. Family members and loved ones of incarcerated people can purchase food for them through Aramark's "iCare" product, which provides "fresh meals" to people who are incarcerated. *Id.* ¶ 35.

Aramark argues it is not engaged in trade or commerce with Plaintiffs and the class because, it asserts, the claim is about the provision of free food. MTD, ¶¶ 11–12. That is incorrect. Plaintiffs allege that they have suffered monetary harm based on their food *purchases* from Aramark; and Aramark does not dispute that Plaintiffs purchased food from it. These transactions qualify as "trade or commerce." *See* W. Va. Code § 46A-6-102(6) (defining trade or

commerce as "advertising, offering for sale, sale or distribution of any goods or services"). Aramark's own description of its food for purchase options confirms the nature of these transactions. That Aramark's scheme to inflate demand for these products includes inadequate provision of free daily meals does not change the commercial nature of the transactions that give rise to the consumer harm.

The commercial transactions at the center of this case, Plaintiffs' food purchases from Aramark's retail commissary, Fresh Favorites, and iCare offerings, are not present in the cases on which Defendants rely. *See* Mem., Dkt. 23, at 11–12. In *Sand v. Milwaukee Cnty. House of Corr.,* No. 19-C-348, 2022 WL 912283, at *1 (E.D. Wis. Mar. 29, 2022), Plaintiff's complaint was based on Defendants' violation of his right to a religious accommodation that required him to be provided with kosher meals. The House of Corrections purchased the kosher meals from Aramark and sought reimbursement for some of the meals from the plaintiff, and Aramark absorbed the rest of the cost. *Id* at *5. The plaintiff did not purchase the kosher meals from Aramark in response to Aramark's offering them for sale in a commercial setting. Likewise, in *Ellibee v. Aramark Corr. Servs., Inc.*, 154 P. 3d 39, 41 (Kan. Ct. App. 2007), another religious accommodation case based on the failure to provide kosher meals, the court found that Aramark was not engaging in trade or commerce because Kansas' consumer protection statute is limited to "individuals who directly contract with suppliers for goods or services" and the plaintiff did not purchase any food from directly from Aramark.

### C. Plaintiffs adequately allege that Defendants engage in an unfair food services scheme.

#### i. Aramark's food services scheme causes or is likely to cause substantial injury to Plaintiffs and the class.

Aramark does not contest that Plaintiffs sufficiently alleged that they suffered

"substantial injury" in the form of monetary harm. *E.g.,* Compl., ¶ 141; *see also, e.g.*, *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010) ("In most cases 'substantial injury' involves monetary harm."); *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.,* 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015) ("Under the standard for unfair practices . . . from the FTCA, a 'substantial' injury in the context of consumer protection is most often a financial one.").

However, Aramark argues that Plaintiffs do not meet the causation portion of this standard; that is—according to Aramark—even if the Court credits all Plaintiffs' allegations that the food in its free daily meals services is inadequate, Plaintiffs do not plausibly allege that this conduct drives them to purchase food from Aramark. MTD at 14–15. Aramark is wrong. Plaintiffs allege throughout the complaint that Aramark's failure to provide them with adequate free daily meals—i.e., the substitution of lower-quality ingredients (canned vegetables for fresh, processed meat for ground beef), failing to provide food in the required amounts, and reuse of leftovers, *see, e.g.*, Compl. ¶¶ 39–59[2]—has driven them to purchase food from Aramark's food-for-purchase programs, which is their only other choice for obtaining food, *e.g.*, *id.* ¶ 25 ("The result of Aramark's scheme is inevitable: incarcerated people and their family members and loved ones are buying food they would not otherwise buy to supplement incarcerated people's diets, resulting in direct profits to Aramark at the expense of incarcerated people and their families); *Id*., at 70 ("Because of the poor quality and quantity of food provided, like many

---

[2] Aramark asserts that these allegations are not related to Mt. Olive. MTD at 13–14. Not so. The majority of the allegations relate specifically to Mt. Olive, Compl. ¶¶ 39–40, 58–59; the 2023 report and Agricultural Commissioner complaint encompass Mt. Olive, *id*. ¶¶ 41, 57; and the complaint sets forth detailed allegations related specifically to the experiences of the named Plaintiffs at Mt. Olive, *id*. ¶¶ 42, 65–69, 76–80, 85–90, 95, 107. That other accounts of Aramark's prison food around the country corroborate Plaintiffs' account is hardly exculpatory for Defendants.

incarcerated people, Mr. Smith supplements his diet from the commissary."); *Id.*, at ¶ 80 ("Over the past approximately two years, the portion sizes of food provided have been so small that Mr. McKinley and others are often not full after eating their meals."); *Id.*, at ¶ 81 ("Like others, Mr. McKinley has to supplement his diet with food items from the commissary."); *Id.*, at ¶ 91 ("Because of the decline in the quality and quantity of the food provided as part of the free daily meal services, Mr. Johnson relied on food he purchased from the commissary operated by Aramark."); *Id.* ¶ 102 ("Despite being on a fixed income, Ms. Rush prioritizes spending money on iCare packages for her son at Mt. Olive because she knows that he is not receiving adequate daily meals services): *Id.* ¶ 107 ("Ms. Riggs purchased food for her brother and continues to purchase food for her friend because they have told her that they do not get enough food to eat, and the food is not good.").

Based on these allegations, it is plausible that Aramark's scheme drives demand for its food-for-purchase programs. It goes without saying that people need sufficient nourishment. West Virginia recognized this as a matter of public policy when it passed the West Virginia Fresh Food Act, in which it declared that incarcerated people shall have "wholesome and sufficient food." *Id.* ¶ 56; W. Va. Code § 7-8-2a(a).

Even if incarcerated people at Mt. Olive are getting enough free food from Aramark in order to *survive*, that does not mean that Aramark's conduct is not causing them to purchase food from Aramark that they would not otherwise purchase—that is, causing them harm. Faced with a lack of wholesome and sufficient food, people will pursue alternative sources. Aramark knows that fresh and flavorful food is important to consumers and that failing to offer it in regular daily meals while offering it for purchase will drive incarcerated consumers and their loved ones to purchase it; this is evidenced by Aramark's use of these terms in its advertising for its

food-for-purchase programs and its other public statements. *See e.g.*, *id.* ¶ 23 ("Aramark's marketing theme for its food-for-purchase programs centers on 'freshness' and 'flavor' to entice consumers to purchase it. Its marketing materials contain pictures of fresh vegetables and a variety of foods"), ¶ 22 (Tim Barttrum, the President and CEO of Aramark Correctional Services stated, "We see the impact on an individual's future in our clients' facilities every day by recognizing their potential and using food as a tool to realize it."), ¶ 21 (Aramark states that better food experiences help "break the cycle of recidivism," "boost[] morale," and are "behavior management tool[s]," and that Aramark "create[s] better food experiences because everyone we serve deserves the respect and dignity of a healthy, nourishing diet."). Aramark is a Fortune 500 company with sophistication in marketing and financial incentives to minimize free food costs while maximizing paid food sales; it is more than plausible that Aramark uses these marketing terms to entice consumers otherwise deprived of sufficient fresh food to purchase meals from it.

**ii. Plaintiffs have adequately alleged that they cannot reasonably avoid purchasing food from Aramark.**

As courts have explained, consumers cannot reasonably avoid harm when a defendant exploits a free market failure. In other words, harm is not reasonably avoidable where consumers lack "free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010). Consumers lack free choice where a business "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer [decision-making]." *FTC v. Walmart Inc.*, 664 F. Supp. 3d 808, 836 (N.D. Ill. 2023) (quotation marks omitted) (alteration in original) (plaintiffs stated claim that injury was not reasonably avoidable); *see also In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, 1984 WL 565290, at *1074 (Dec. 21, 1984) ("Most of the [FTC]'s unfairness matters are brought" to "halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking."). Whether consumers

have a "free and informed choice," also depends on whether consumers have the "means to avoid" the harm, *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387–88 (S.D.N.Y. 2023).

Aramark's monopolistic arrangement here both creates and takes advantage of obstacles to the free exercise of consumer decision-making by incarcerated people and their loved ones, leaving incarcerated people and their loved ones with no means to avoid the harm. Aramark has taken control of every channel people in prison have of receiving food; it alone controls the quantity and quality of daily meals, and it alone sells food to make up for shortcomings in those daily meals. When faced with inadequate daily meals in prison, Plaintiffs who are loved ones of incarcerated people cannot cook for their family members, Plaintiffs cannot weigh alternative options for buying food—all they have is one option: Aramark.

Courts have regularly found that, faced with this kind of monopoly control, consumers cannot reasonably avoid the injuries created by consumer transactions. For example, in *Greenberg v. Amazon.com, Inc.*, consumers argued that they had been "forced to rely on Amazon to obtain essential goods" during the Covid-19 pandemic, and that Amazon had taken advantage of its unique market position to raise prices in that period. 553 P.3d 626, 637–38 (Wa. 2024). The Court analyzed Washington's UDAP statute, whose remedial language is identical to the WVCCPA's,[3] to conclude that where Plaintiffs alleged "they had no meaningful choice but to purchase their products from Amazon," *id.* at 642, they had stated a claim for unfairness under

[3] The WVCCPA and Washington's Consumer Protection Act are identical in relevant respects. Both outlaw "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." RCWA19.86.020; W. Va. Code § 46A-6-104. Both provide that their purpose "is to complement the body of federal law governing . . . unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition," that their interpretation should be "guided by" federal law, including decisions by the Federal Trade Commission, and that each "shall be liberally construed . . . that its beneficial purposes may be served." RCWA 19.86.920; W. Va. Code § 46A-6-101(1).

the state's consumer protection law.

Defendants suggest that Plaintiffs did have a choice because they could have simply not eaten any food beyond the daily meals, and they suggest that some incarcerated people likely did not purchase food from Aramark. But that is purely speculation, and the unfairness question is not whether it is literally possible to avoid the injury, but whether it is *reasonably* possible to do so. The Washington Supreme Court in *Greenberg* found that consumers had stated a claim that harm was not reasonably avoidable where they had purchased items including yeast to bake bread on Amazon, even though this injury was literally avoidable—yeast is not essential for living, and the court acknowledged that the plaintiffs could have lawfully gone to the grocery store to make these purchases. *Greenberg*, 553 P.3d at 635. Courts have never required a showing that literally every consumer suffered an injury in order to show that the injury was not reasonably avoidable. Indeed, in *Greenberg*, some consumers in Washington undoubtedly did not make purchases on Amazon and suffer price-gouging during the pandemic; that did not defeat the plaintiffs' argument that the harm was not reasonably avoidable.

And as a factual matter, the question of whether Plaintiffs could simply not have purchased food turns on the sufficiency of Aramark's daily meals, and Plaintiffs have alleged facts making it plausible that the food was inadequate, such that they could not reasonably avoid supplementing it. That is all that is required at this stage. *See, e.g.*, *In re: Social Media Adolescent Addiction*, 777 F. Supp. 3d 1016 (N.D. Cal. 2025); *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 625 (D.N.J. 2014) (whether an injury is reasonably avoidable is question of fact inappropriate for motion to dismiss).

**iii. Plaintiffs' injury is not outweighed by countervailing benefits to consumers or to competition.**

Aramark does not argue the injury is outweighed by countervailing benefits to consumers

or to competition, nor can it. The injury to Plaintiffs is not outweighed by any benefit to them—they are forced to spend scarce resources buying food that should be provided for free. And there is no benefit to competition—Aramark has eliminated competition by acquiring exclusive control over all food in the facility. This monopolistic practice is the opposite of a benefit to competition. *See Greenberg*, 553 P.3d at 642 (the fact that "Amazon's sales accounted for almost half of all U.S. retail e-commerce . . . suggests there is no benefit to competition.").

**D. Defendants' arguments about claims Plaintiffs have not pled are irrelevant.**

Defendants also argue that Plaintiffs cannot sustain claims they did not plead. MTD at 8 (Section 1983 claim), *id*. at 9–11 (breach of contract claim). But "the civil plaintiff is the 'master of his complaint' and 'determines the claims . . . to bring.'" *Steves & Sons, Inc. v. JELD-WEN, Inc.,* 988 F.3d 690, 728 (4th Cir. 2021) (quoting *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 405–06 (4th Cir. 2013)). How other claims would fare is particularly irrelevant in the WVCCPA context, because as the Supreme Court of Appeals of West Virginia has repeatedly affirmed, the "purpose of the CCPA is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers *who would otherwise have difficulty proving their case under a more traditional cause of action*." *Barr*, 711 S.E.2d at 582 (emphasis added) (quotation marks omitted).

Aramark also contends this is "a breach of contract case [disguised] as a consumer protection one." MTD at 9–10. The cases upon which Aramark relies relate to statutes not at issue here and are otherwise inapposite. In *Reid v. Unilever U.S., Inc.*, unlike here, the plaintiffs brought *both* a breach of contract claim *and* a claim under Illinois' consumer protection statute, and the court dismissed the latter claim as duplicative. 964 F. Supp. 2d 893, 913 (N.D. Ill. 2013). Here, there is no express contract, and no breach of contract claim. *Woodard v. Victory Records* is

even less relevant. No.1:11-cv-07594, 2016 WL 1270423, at *8 (N.D. Ill. Mar. 31, 2016). There, the court held that a contracting party's failure to provide detailed invoices does not constitute a deceptive practice under Tennessee's or Illinois's consumer protection statutes. That holding has no bearing here.

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CLAIM FOR ECONOMIC DURESS.

Defendants' argument about Plaintiffs' claim for economic duress fails for the same reason as the argument about Plaintiffs' unfairness claim—Plaintiffs have alleged that they had no reasonable alternative but to purchase food from Aramark. Economic duress exists where a defendant uses its "superior economic power" "unlawfully or unreasonably" such that the plaintiff has "no reasonable alternative but to acquiesce." *Mach. Hauling, Inc. v. Steel of W. Va.*, 384 S.E.2d 139, 142–43 (W. Va. 1989). The "no reasonable alternative" question in the economic duress context tracks the "not reasonably avoidable" unfairness question: a plaintiff has no reasonable alternative where the defendant exploits a market failure. *See West Virginia Transp. Co. v. Sweetzer*, 25 W. Va. 434 (W. Va. 1885) (economic duress where plaintiff was forced into transaction by virtue of defendant's monopoly control). Because, as explained above, Plaintiffs have alleged that Aramark has created a situation in which they cannot choose among alternatives and are forced to buy food from it to supplement inadequate free daily meals, they have stated a claim for economic duress.

*Panetta v. Chesapeake Energy Corp.*, 2010 WL 1930160 (S.D. W. Va. May 12, 2010), on which Defendants rely, is not to the contrary—in *Panetta*, the Court found that there was no economic duress in being required to sign an employment contract that required arbitration, because the plaintiff was free not to sign the contract and not to work for defendant. The analysis turned on the existence of a free market, which is the opposite of what Defendants have created

here. In *Panetta*, the plaintiff could work elsewhere; here, Plaintiffs are forced to rely entirely on Aramark to provide food; there is no other avenue available to avoid Defendants' conduct.

### III. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CLAIM FOR UNJUST ENRICHMENT.

"Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 n.2 (W. Va. 1984). Defendants contend because, in their view, Plaintiffs have not alleged that they were coerced to purchasing food, they have not alleged that it was inequitable for Aramark to retain their money. But as described above, Plaintiffs have alleged that Aramark engaged in a scheme whereby they had no reasonable alternative but to purchase food from Aramark, making it inequitable for Aramark to retain the money it made on this scheme. *See Realmark Devs., Inc. v. Ranson*, 542 S.E. 2d 880, 884 (W. Va. 2000) (unjust enrichment occurs where "it would be inequitable and unconscionable to permit the party receiving" the benefit to retain it). Thus, Plaintiffs have sufficiently pleaded their claim for unjust enrichment.

### IV. THE INCARCERATED PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THEY HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES.

Finally, Defendants claim that the incarcerated Plaintiffs failed to exhaust their administrative remedies, as required by the West Virginia Prison Litigation Reform Act, W. Va. Code § 25-1A-2. This argument fails for at least two reasons: (1) failure to exhaust is an affirmative defense, not a pleading requirement, and (2) the incarcerated Plaintiffs have alleged they met the formal exhaustion requirement and have also otherwise fulfilled its purposes.[4]

---

[4] Defendants also argue that Plaintiff Johnson lacks standing to seek injunctive and declaratory relief because, at the time the complaint was filed, he was no longer incarcerated at Mt. Olive. *See* Mem. at 16–17; Compl. ¶ 10. Since then, Mr. Johnson has transferred back to Mt. Olive and presently has standing to seek injunctive and declaratory relief, and the motion should be denied on that ground. Mr. Johnson's inmate locator record, showing his current location at Mt. Olive, is

Failure to exhaust under the WVPLRA—simlar to the federal Prison Litigation Reform Act—is an affirmative defense, and plaintiffs are not required to plead exhaustion. *See Jones v. Bock*, 549 U.S. 199, 216 (2007) (applying this standard under the PLRA); *Bragg v. WV Dep't of Corr. & Rehab.*, No. CV 2:20-00577, 2023 WL 2979028, at *3 (S.D. W. Va. Mar. 20, 2023), *R&R adopted*, 2023 WL 2974484 (S.D. W. Va. Apr. 17, 2023) (same under WVPLRA). "[A] district court, at the pleadings stage, may not dismiss a claim based on the plaintiff's failure to affirmatively show exhaustion . . . ." *Wilcox v. Brown*, 877 F.3d 161, 167 (4th Cir. 2017).

Defendants concede that failure to exhaust is an affirmative defense. MTD, Dkt. 22, at 17. But they nonetheless seek to dimiss the incarcerated Plaintiffs' claims through a "rare" exception where a court may "dismiss a complaint when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies." *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). That exception is inapplicable here; Plaintiffs alleged that they "have filed formal grievances and lodged informal complaints about the inadequate food and expensive food-for-purchase programs." Compl. ¶ 5; *see also id.* ¶ 42. Taken as true, these allegations show that the incarcerated Plaintifs satisfied the requirements of § 25-1A-2.[5]

---

attached as Exhibit A. Exhibit A is a public governmental record, the authenticity of which may not be reasonably questioned, and thus it may be considered by the Court at this stage without converting Defendants' motion into a motion for summary judgment. *See* § *1357 Motions to Dismiss—Practice Under Rule 12(b)(6)*, 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed.). Importantly, Defendants do not dispute that the other incarcerated Plaintiffs have standing to seek injunctive and declaratory relief. While this plaintiff population may be transferred without their consent, hundreds of class members and all currently incarcerated named plaintiffs indisputably have standing to seek injunctive relief. Plaintiffs will address any changes in standing as the case continues.

[5] Defendants fault Plaintiffs for "not alleg[ing] any further information about" their grievances, stating that the fact Plaintiffs did not allege the grievances' "content and what became of them[] rais[es] serious questions as to whether these incarcerated Plaintiffs . . . have exhausted their remedies." Mem., Dkt. 23, at 17–18. This implication falls flat in the face of the Supreme Court's explicit instruction that "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216.

Defendants nevertheless assert that the incarcerated Plaintiffs' claims should be dismissed because their "grievances do not address the subject matter of the claims in this particular case," MTD, Dkt. 22, at 18 (quotation and citation omitted), and Defendants claim there is a "material difference between Plaintiffs' alleged grienvances and their *theory of the case*," *id.* (emphasis supplied). Neither argument avails.

As this Court has recognized, "[t]he purpose of the grievance is to provide prison officials a fair opportunity to address an inmate's complaint." *Insco v. Wexford Health Sources, Inc.*, No. 2:19-CV-00612, 2020 WL 2770419, at *9 (S.D. W. Va. May 28, 2020) (Johnston, J.). "A grievance need not include legal terminology or legal theories" in order to provide prison officials with an opportunity to redress the claimed wrong. *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009); *see also Wasanyi v. Aramark Servs., Inc.*, No. 2:23-CV-00575, 2024 WL 4472357, at *6 (S.D. W. Va. July 2, 2024), *R&R adopted*, 2024 WL 4274700 (S.D. W. Va. Sept. 24, 2024). Instead, it need only contain information "sufficient to 'alert the prison to the nature of the wrong for which redress is sought.'" *Wilcox*, 877 F.3d at 167 n.4 (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

The complaint allegations that the incarcerated Plaintiffs filed grievances regarding the "inadequate food and expensive food-for-purchase programs" at Mt. Olive, Compl. ¶ 5, are sufficient to alert the prison to the subject matter of the wrongs for which redress is sought. Discovery will confirm that the grievances describing the inadequate food in the daily meals service and the expensive food from the commissary and Fresh Favorites and that Plaintffs fully exhausted the available administrative remedies.[6] Like in *Insco*, the incarcerated Plaintiffs'

---

[6] *Wasanyi v. Aramark Svcs.* held that a grievance describing racial discrimination was not sufficient to put prison officials on notice of claims of "deliberate indifference to a safe work environment" and retaliation under the First Amendment. No. 2:23-cv-575, 2024 WL 4472357,

grievances "alerted prison officials to the alleged problem"[7] with the food at Mt. Olive "and permitted prison officials . . . to examine whether [Aramark's] policies or practices were the cause of Plaintiff's complaints." *Insco*, 2020 WL 2770419, at *9.

Finally, in this case, the "purpose of the grievance," *id.*, was additionally served by the pre-suit notice required by the WVCCPA, W. Va. Code § 46A-5-108(a). As Aramark acknowledges, the incarcerated Plaintiffs provided Aramark with notice of "the alleged violation and [its] factual basis" at least 45 days before they filed suit. MTD, Dkt. 22, at 11 n.3. As such, Aramark cannot argue it lacked advance knowledge of the nature of Plaintiffs' claims or an opporuntiy to redress the wrong. Because Plaintiffs satisfied the formal grievance procedures and also fulfilled the underlying purpose of the exhaustion requirement, Defendants' motion to dismiss should be denied.

**CONCLUSION**

For the reasons stated herein, the Plaintiffs respectfully request that the Court deny the Defendants' motion to dismiss in its entirety.

RESPECTFULLY SUBMITTED,
PLAINTIFFS SMITH, ET AL.,
By Counsel:

*/s/ Lydia C. Milnes*
Lydia C. Milnes (WV Bar No. 10598)

---

at *2, 6 (S.D. W. Va. July 2, 2024). Here, by contrast, Plaintiffs' grievances about the quality of free daily meals service and the expensive pay-for-food options were sufficient to give prison officials an opportunity to address the wrongs asserted. Similarly, *Lowe v. Johnson* held that a grievance complaining that a medical professional inappropriately stopped a prisoner's medication was insufficient to put the company's CEO on notice of a potential supervisory liability claim. No. 2:17-CV-02345, 2018 WL 4222829, at *1, 7 (S.D. W. Va. Aug. 13, 2018), *R&R adopted*, 2018 WL 4212416 (S.D. W. Va. Sept. 4, 2018). Here, Plaintiffs alleged that Aramark received grievances related to food quality and expensive food for purchase programs and was therefore on notice of the potential claims against it.

[7] Aramark is provided with grievances related to food quantity and quality, *see* Compl. ¶¶ 5, 139, and so was also put on notice and had an opportunity to address the alleged wrong.

Mountain State Justice, Inc.
1029 University Ave., Suite 101
Morgantown, WV 26505
p. 304.326.0188
f. 304.326.2040
lydia@msjlaw.org
lesley@msjlaw.org

Shennan Kavanagh (MA BBO # 655174)*
Jennifer Wagner (WV Bar No. 10639)
Caroline Cohn (MA BBO # 711850)*
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
p. 617.542.8010
f. 617.542.8028
skavanagh@nclc.org
jwagner@nclc.org
ccohn@nclc.org

Rebecca Livengood (D.C. Bar No. 674010)*
Stephen Hayes (D.C. Bar No. 1010531)*
Edward Olds (D.C. Bar No. 90004730)*
Relman Colfax PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
p. 202.728.1888
f. 202.728.0848
rlivengood@relmanlaw.com
shayes@relmanlaw.com
tolds@relmanlaw.com

** Visiting Attorneys*

*Attorneys for Plaintiffs*