**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ROGER D. SMITH, et al.,

Plaintiffs,

v. CIVIL ACTION NO. 2:25-cv-00710

ARAMARK CORPORATION**,** et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion to Dismiss filed by Defendants Aramark Corporation, Aramark Correctional Services, LLC, and Union Supply Group (collectively, "Defendants" or "Aramark"). (ECF No. 22.) For the reasons discussed herein, the motion is **DENIED**.

## ***I. BACKGROUND***

This matter arises out of Defendants' provision of meals to incarcerated individuals in the State of West Virginia.[1] (*See* ECF No. 1.) According to the Complaint, Defendants are "engaging in a scheme" that "extorts profits from incarcerated consumers and their loved ones by failing to provide incarcerated people with adequate, free daily meal services . . . ." (*Id.* at 2, ¶ 3.) The Complaint asserts that the State has contracted with Defendants to provide "the mandated free daily meals services to people incarcerated" in West Virginia, for "which the State pays." (*Id.* at 1–2, ¶ 2.) Evidently, inmates (or their friends and families) also have multiple options to purchase

[1] The Complaint focuses on those incarcerated in the Mount Olive Correctional Complex in Fayette County, West Virginia ("Mount Olive"). (*See generally* ECF No. 1.)

food. (*Id.*) Specifically, Defendants allegedly offer (1) a commissary; (2) a "Fresh Favorites" program, which is available to incarcerated individuals; and (3) an "iCare" program, in which others can purchase and send food to incarcerated individuals. (*Id.*) Ultimately, the Complaint claims that Defendants have "exclusive control" over all food options in West Virginia's correctional facilities, and incarcerated individuals are a "captive market and have no choices for obtaining or purchasing food" from any other source. (*Id.* at 1–2, ¶¶ 2, 4 (also stating that incarcerated individuals "are not allowed to receive food directly from family members or other loved ones, and they are not allowed to purchase food from any vendor other than Aramark").)

The supposed scheme involves "limiting the quality, quantity, and variety of daily meals services," which forces incarcerated individuals to purchase food from Defendants. (*Id.* at 2–3, ¶ 4.) In particular, the Complaint alleges that Defendants provide "inadequate quantities of food, inappropriately reus[e] left over and spoiled food, and fail[] to serve required amounts and varieties of fresh foods such as vegetables, unprocessed meats, and dairy." (*Id.* at 11, ¶ 39; *id.* at 3, ¶ 6 (claiming that employees, *inter alia*, "reus[e] leftovers that should be discarded due to being past their expiration date or spoiled").) As a result, incarcerated individuals "are forced to buy food with money that they could use for other purposes, such as communicating with family, purchasing over-the-counter medications, or saving for reentry," and their "family members and loved ones" are forced to buy food instead of using that money to support rehabilitation efforts or support themselves and their families. (*Id.* at 3, ¶ 7.) Conversely, this purported scheme benefits Defendants in two ways: (1) "it saves costs on its daily meals services business by providing less, reused, and poor-quality food," while (2) "earning more money from incarcerated consumers' purchases from its food-for-purchase programs." (*Id.* at 2–3, ¶ 4.)

To make matters worse, this is ostensibly not a mistake or mere oversight. Rather, the Complaint contends that Defendants know or should know that incarcerated individuals "are not receiving adequate daily meals because its contracts with the State contain detailed and objective criteria governing its daily meals services, which it does not meet." (*Id.* at 3, ¶ 5.) Further, according to the Complaint, "numerous individuals" have "filed formal grievances and lodged informal complaints about the inadequate food and expensive food-for-purchase programs," which were provided to Defendants. (*Id.*) In fact, Defendants allegedly "incentivize[]" employees "to engage in its scheme by giving them bonuses when they save money on daily meals services." (*Id.*, ¶ 6.)

Consequently, Plaintiffs Roger Smith, Marcus McKinley, William Johnson, Sandra Rush, and Judy Riggs (collectively, "Plaintiffs") filed this action, representing themselves and others similarly situated. (*See generally id.*) The Complaint asserts three causes of action: (1) Unfair Acts and Practices in Violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA"); (2) Common Law Economic Duress; and (3) Common Law Unjust Enrichment. (*Id.* at 26–31.) Plaintiffs ask for class action certification; declaratory judgment that Defendants' actions are unlawful under West Virginia law; injunctive relief to enjoin Defendants' alleged scheme; an order for "disgorgement and restitution of Defendants' unlawful profits"; "actual or statutory damages, whichever is greater"; punitive damages; and costs and attorneys' fees. (*Id.* at 31–32.)

Defendants filed the pending Motion to Dismiss. (ECF Nos. 22, 23.) Plaintiffs filed a response, (ECF No. 28), and Defendants filed a reply, (ECF No. 29).[2] As such, this motion is fully briefed and ripe for adjudication.

## *II. LEGAL STANDARD*

Defendants move to dismiss pursuant to Rule 12(b)(1) and 12(b)(6). Both standards are provided in turn below.

### *A. Subject Matter Jurisdiction*

It is axiomatic that a court must find it has jurisdiction before determining the validity of any claims brought before it. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "The burden of showing the existence of subject matter jurisdiction rests on the plaintiff." *Adkins v. United States*, 923 F. Supp. 2d 853, 857 (S.D. W. Va. 2013) (citation omitted). "If the plaintiff fails to meet this burden, then the claim must be dismissed." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005) (citing *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001)).

### *B. Failure to State a Claim*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff,

[2] Plaintiffs also filed a Motion for Leave to File a Surreply, (ECF No. 30), with a proposed surreply attached, (ECF No. 30-1). Plaintiffs' proposed surreply addresses Defendants' argument that Plaintiffs Judy Riggs's ("Riggs") and Sandra Rush's ("Rush") claims should be dismissed because they did not provide the statutorily required notice of their claims. (*See id.* at 11, n.3; *see also* ECF No. 29 at 9.) However, Defendants later concede that Plaintiffs Riggs and Rush did provide the statutorily required notice of their claims and withdrew that argument. (ECF No. 31.) Therefore, the surreply is unnecessary, and Plaintiff's Motion for Leave to File a Surreply, (ECF No. 30), is **DENIED AS MOOT**.

the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## *III. DISCUSSION*

In the pending motion, Defendants argue that all claims should be dismissed for various reasons. (ECF No. 23.) First, they assert that Plaintiffs have failed to state any claims. (*Id.* at 13–21.) Second, they argue that Plaintiff William Johnson ("Johnson") lacks standing to seek injunctive and declaratory relief. (*Id.* at 21–22.) Third, they claim that the incarcerated Plaintiffs have not alleged that they exhausted their administrative remedies. (*Id.* at 22–24.) Each argument is addressed below.[3]

[3] The latter two arguments are addressed first. Defendants' standing argument challenges the Court's subject matter jurisdiction, without which, the Court cannot address the merits of Plaintiff Johnson's claims. *See Shing v. MD Dev. Disabilities Admin.*, 698 Fed. App'x 70, 72 (4th Cir. 2017) (explaining that "a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits"). While Defendants' argument regarding the alleged failure to exhaust administrative remedies does not implicate the Court's jurisdiction, *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("Failure to exhaust available administrative remedies is an affirmative defense, not a jurisdictional requirement"), it is a threshold question that must be decided before determining the merits of a case, *see Russell v.*

### *A. Standing*

Article III of the United States Constitution constrains the judicial authority of federal courts to "cases" and "controversies." U.S. Const. art. III; *see also Bishop v. Barlett*, 575 F.3d 419, 423 (4th Cir. 2009) (collecting cases). In turn, "'the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process,' and thus meet the requirements of Article III. *Bishop*, 575 F.3d at 423 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 154–55 (1990)). The standing doctrine has both constitutional and prudential components. *Id.* In order to satisfy the constitutional component of Article III standing,[4] a party must meet three requirements:

> (1) the party has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (internal alterations, quotations, and citations omitted). "In determining whether a party has standing to bring suit, the party invoking the jurisdiction of the court bears the burden of establishing standing." *Id.* at 424 (internal citations omitted).

Here, Defendants argue that Plaintiff Johnson lacks standing to seek injunctive or declaratory relief because he is no longer incarcerated at Mount Olive. (ECF No. 23 at 21.) Defendants reason that, generally, a prisoner's "release from a particular prison *moots* his claims for injunctive and declaratory relief with respect to his incarceration there." (*Id.* (emphasis added; quoting *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009)).) While Plaintiffs acknowledge

---

*Butcher*, Civil Action No.: 2:19-cv-00918, 2020 WL 4043080, at *5 (S.D. W. Va. July 17, 2020).

[4] Defendants only seemingly challenge the constitutional components in this case. (*See* ECF Nos. 23, 29.)

that, at the time the complaint was filed, Plaintiff Johnson was no longer incarcerated" at Mount Olive, he has since been "transferred back" to Mount Olive. (ECF No. 28 at 17, n.4.)

Defendants are correct that "'[w]hen evaluating *standing*, [courts] must look to the facts at the time the complaint was filed.'" (ECF No. 29 at 15 (emphasis added; quoting *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022)).) However, their reliance on *Rendelman* and other similar caselaw is misplaced. (*See* ECF No. 23 at 21.) Those cases, in which prisoners were released from incarceration after filing complaints, address the issue of mootness, which is related to but distinct from standing. *See, e.g.*, *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) ("Unlike standing, which is determined at the commencement of a lawsuit, subsequent events can moot an otherwise validly raised claim." (internal alterations, quotations, and citations omitted)); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011); *compare Bishop*, 575 F.3d at 424 ("[T]he party invoking the jurisdiction of the court bears the burden of establishing standing.") *with Deal*, 911 F.3d at 191 ("[A] party asserting mootness bears a 'heavy burden of persuading' the court that 'subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."); *see also Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929, 944 (D. Md. 2021) (recognizing that, for a motion to dismiss based on standing, the Court only considers the allegations in the complaint, whereas for a motion to dismiss on mootness grounds, the Court can also consider evidence outside the pleadings without converting the proceeding to one for summary judgment).

Undoubtedly, Defendants do not argue that Plaintiff Johnson originally had standing but that his subsequent release mooted requested his injunctive and declaratory relief. Rather,

Defendants insist that Plaintiff Johnson *never* had standing to pursue these types of relief. (ECF No. 23 at 21 ("[I]njunctive and declaratory relief cannot redress any injury suffered by a Plaintiff who is no longer incarcerated at M[ount] Olive or does not have a loved one incarcerated there."). This argument clearly challenges the third element of the constitutional component of standing: redressability. *See Bishop*, 575 F.3d at 423.

However, beyond citing cases discussing mootness, Defendants' argument related to redressability is almost nonexistent. The only semi-substantive statement Defendants offer is that "[o]nce an inmate is removed from the environment in which he is subject[ed] to the challenged policy or practice . . . he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." (*See* ECF No. 23 at 22 (reasoning that an "[a]pplication of that straightforward principle" of mootness "requires dismissal of Plaintiff Johnson's request for injunctive and declaratory relief"); *see generally* ECF No. 29.) This barebones "argument" is insufficient to address the extensive contours of redressability. *See, e.g.*, *Jonathan R. by Next Friend Dixon v. Morrisey*, 178 F.4th 139, 151–62 (4th Cir. 2026) (spending over ten pages discussing redressability in terms of injunctive and declaratory relief). Thus, because this issue is not fully briefed, the Court declines to resolve it at this juncture. *See Parsley v. Rushmore Loan Mgmt. Servs. LLC,* No. CV 3:23-0525, 2024 WL 712873, at *9, n.6 (S.D. W. Va. Feb. 21, 2024) (Chambers, J.); *Spurling v. Metro. Life Ins. Co.*, No. 2:24-CV-00614, 2025 WL 1840669, at *12 (S.D. W. Va. July 3, 2025) (Johnston, J.) (declining to "act as an advocate for" or "conjure up questions never squarely presented" by attorneys).

Accordingly, Defendants' motion is **DENIED WITHOUT PREJUDICE** insofar as it argues that Plaintiff Johnson lacks standing to seek injunctive or declaratory relief.

***B. Exhaustion of Administrative Remedies***

The West Virginia Prison Litigation Reform Act ("WVPLRA") makes it mandatory for an inmate to first exhaust administrative remedies provided by the inmate's correctional facility before instituting a civil action challenging the inmate's confinement. W. Va. Code § 25-1A-2; *see also White v. Haines*, 618 S.E.2d 423, 431 (W. Va. 2005) ("[B]efore an inmate may bring a civil action challenging the conditions of his/her confinement, he/she must first exhaust the administrative remedies provided by the correctional facility in which he/she is housed."). Under the WVPLRA, "[a]n inmate may not bring a civil action regarding an ordinary administrative remedy until the procedures promulgated by the agency have been exhausted." W. Va. Code § 25-1A-2(c). An "ordinary administrative remedy" is "a formal administrative process by which an inmate submits a grievance seeking redress or presenting concerns regarding any general or particular aspect of prison." *Id.* § 25-1A-2(a). The WVPLRA provides that an ordinary administrative remedy is considered exhausted "when the inmate's grievance complies with duly promulgated rules and regulations regarding inmate grievance procedures, has been accepted, fully appealed, and has received a final decision from the Commissioner of Corrections or the Commissioner's designee . . . ." *Id.* § 25-1A-2(d).

In accordance with § 25-1A-2, the West Virginia Division of Corrections and Rehabilitation has instituted uniform procedures for filing inmate grievances, which are found in Policy Directive 335.00. *See Miller v. Rubenstein*, No. 2:16-cv-05637, 2018 WL 736044, at *5 (S.D. W. Va. Feb. 6, 2018) (providing full procedural requirements). If an inmate fails to fully comply with the provisions of those rules, the inmate "shall not be considered to have taken full

advantage of administrative remedies afforded him/her and therefore has not exhausted administrative remedies." *Id.* (citing Policy Directive 335.00(V)(D)(4)).

As noted above, though, the "[f]ailure to exhaust available administrative remedies is an affirmative defense . . ., and *thus inmates need not plead exhaustion*, *nor do they bear the burden of proving it*." *Moore*, 517 F.3d at 725 (emphasis added). Failure to exhaust may be a basis for a dismissal for a failure to state a claim. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *see also Legg v. Adkins*, No. 2:16-CV-01371, 2017 WL 722604, at *2 (S.D. W. Va. Feb. 23, 2017) (granting a motion to dismiss a prisoner's claims for failure to exhaust under the PLRA and WVPLRA). However, "only in rare cases will a district court be able to conclude from the face of the complaint that a prisoner has not exhausted his administrative remedies and that he is without a valid excuse." *See Moore*, 517 F.3d at 725 (quoting *Freeman v. Watkins*, 479 F.3d 1257, 1260 (10th Cir. 2007)).

Here, the Complaint specifically alleges that "formal grievances . . . about the inadequate food and expensive food-for-purchase programs" have been filed. (ECF No. 1 at 3, ¶ 5.) Defendants argue that this is insufficient. Defendants reason that, "even assuming arguendo that each Plaintiff had exhausted his claims relating to 'inadequate food and expensive food-for-purchase programs,'" the exhaustion requirement is not satisfied "because those grievances do not 'address the subject matter of [the] claims' in this particular case." (ECF No. 23 at 23 (internal citations omitted).) Specifically, Defendants assert that there is a "material difference" between Plaintiffs' alleged grievances regarding inadequate meals or expensive for-purchase programs and the Complaint's allegations that Defendants "engaged in a 'scheme' to 'extort[] profits from incarcerated consumers and their loved ones.'" (*See id.* (internal citations omitted); *see also* ECF No. 29 ("[I]t is not plausible that separate grievances about the free food and the 'expensive food'

would alert prison officials of the alleged scheme through which Plaintiffs were coerced to buy the latter.”).) Relying on caselaw from this Court, Defendants contend that “[b]ecause this mismatch . . . is clear from the face of the Complaint, the Court can and should dismiss their claims for failure to exhaust.” (ECF No. 23 at 24.)

Plaintiffs succinctly explain why this argument fails. (ECF No. 28 at 24–25.) While “grievances are not required to rehearse the legal arguments and claims later asserted against the defendants in a lawsuit[,]” they are “expected to address the subject matter of [a prisoner’s] potential claims.” *See Lowe v. Johnson*, No. 2:17-cv-02345, 2018 WL 4222829, at *8 (S.D. W. Va. Aug. 13, 2018), *report and recommendation adopted*, 2018 WL 4212416 (S.D. W. Va. Sept. 4, 2018) (citing *Griffen v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009)). Here, although the grievances may not have included specific legal theories or claims, the subject matter of both the alleged grievances and the Complaint is the “inadequate food and expensive food-for-purchase programs.” *See Insco v. Wexford Health Sources, Inc.*, No. 2:19-CV-00612, 2020 WL 2770419, at *8–9 (S.D. W. Va. May 28, 2020) (reasoning that Plaintiff exhausted his administrative remedies for his claim that the defendant “maintained an unconstitutional policy or practice” of denying certain medication by way of a single grievance, which merely complained that Plaintiff was ‘deni[ed] [] access to a hepatologist’ and ‘denied medical treatment’ for his Hepatitis C despite his expressed ‘emotional duress, pain in side, [and] loss of sleep’” on one specific date because it sufficiently “grieved the implementation and application of the [] policy that purportedly refused the use of [certain medication] unless the inmate was critically ill”). Indeed, Defendants’ “scheme to extort profits” rests on a foundation of the alleged “inadequate food and expensive food-for-purchase programs.” (*See* ECF No. 1 at 2–3, ¶¶ 4, 7.) Defendants’ attempt to draw a contrast

between the Complaint and the grievances because the latter do not specifically mention a "scheme" is a far cry from other cases in which this Court has found that inmates' grievances did not address the subject matter of the relevant claims. *Compare Insco*, 2020 WL 2770419, at *8–9 *with Wasanyi v. Aramark Servs., Inc.*, No. 2:23-CV-00575, 2024 WL 4472357, at *7 (S.D. W. Va. July 2, 2024), *report and recommendation adopted,* No. 2:23-CV-00575, 2024 WL 4274700 (S.D.W. Va. Sept. 24, 2024) ("[A]lthough Plaintiff's grievance complains about being treated poorly and being fired by Defendant Hill, he characterizes that *treatment as being based on his race* and not his alleged complaints about the *conditions in the kitchen*." (emphasis added)).

Accordingly, Defendants' Motion to Dismiss, (ECF No. 22), is **DENIED** insofar as it seeks to dismiss any portion of Plaintiffs' Complaint for failure to exhaust administrative remedies.

### *C. Failure to State a Claim*

Defendants argue that Plaintiffs have failed to state a claim under any count of the Complaint. (*See* ECF No. 23.) Each argument is addressed below.

#### 1. Disguised Breach of Contract Claim

Plaintiffs do not assert a breach of contract claim. (*See generally* ECF No. 1.) Nevertheless, Defendants state that "Plaintiffs are attempting to disguise a breach of contract case as a consumer protection one." (ECF No. 23 at 14 ("At its heart, the basis of Plaintiffs' complaint is that Aramark allegedly failed to deliver the quality and quantity of free food that was required by its contract with West Virginia.").) To that extent, Defendants argue that the Court should dismiss Plaintiffs' WVCCPA claim[5] because other "[c]ourts have rejected this feint in similar contexts." (*Id.*)

[5] Defendants also argue that "[e]ven if Plaintiffs had asserted a breach of contract claim against Aramark . . . such a claim would fail because they are not parties to the contract and have not alleged they are third-party beneficiaries to

Conversely, Plaintiffs contend that the cases upon which Defendants rely are inapposite to the present case. (ECF No. 28 at 20–21.) The Court agrees.

In *Reid v. Unilever U.S., Inc.*, the Court dismissed the plaintiff's consumer protection claim because it lacked any deceptive conduct distinct from a breach of contract claim. *See* 964 F. Supp. 2d 893, 913 (N.D. Ill. 2013) (noting that, with one exception, the plaintiffs' "misrepresentation allegations are mere restatements of the claimed breach of warranties" and the plaintiffs "have not alleged any distinct deceptive conduct"); *see also Woodard v. Victory Records*, No.1:11-cv-07594, 2016 WL 1270423, at *8 (N.D. Ill. Mar. 31, 2016) (finding that the plaintiff did not plausibly allege any deceptive conduct because "[t]he cornerstone" of the consumer protection claims was that royalty statements "were deceptive and misleading[] because they omitted information that would have made clear" that the contract was being breached, and the court did "not believe that the law imposes such an affirmative burden upon a party to a contract to do so, absent a contractual obligation or statutory or regulatory requirement compelling such disclosures"). As Defendants note,[6] (ECF No. 29 at 7), the *Reid* Court recognized that "to set forth an action under a consumer protection law, a party must allege unfair or deceptive conduct that is distinct from a simple breach of contract," because "[w]ere it otherwise, a plaintiff 'could convert any suit for breach of contract into a consumer fraud action.'" 964 F. Supp. 2d at 913 (internal citations omitted); *see also Woodard*, 2016 WL 1270423, at *7–8 (recognizing that consumer protection claims require "some

---

it." (ECF No. 23 at 15.) However, because Plaintiff did not assert a breach of contract claim, the Court need not address the merits of such a hypothetical claim. (*See also* ECF No. 28 at 20 (noting that "Defendants also argue that Plaintiffs cannot sustain claims they did not plead.")

[6] Defendants curiously call this a "core holding in *Reid*," (ECF No. 29 at 7), even though it is simply part of a rule block.

deception, misrepresentation or unfairness, regardless of any breach of contract" (internal citation omitted)).

Plaintiffs have undoubtedly done so here. Beyond the allegation that Defendants are not providing adequate daily meals in accordance with their contracts with the State, Plaintiffs also allege that Defendants are doing so intentionally to force inmates and family/friends to purchase food and, in fact, are incentivizing employees to do so. That alleged deceptive conduct is distinct from a simple breach of contract claim. *See Reid*, 964 F. Supp. 2d at 913.

The last case Defendants cite to for the first time in their reply is *Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 834–35 (S.D. W. Va. 2014). (*See* ECF No. 29 at 6.) In *Tinsley*, this Court dismissed a WVCCPA claim, in part, under the gist of the action doctrine because it was duplicative to an asserted breach of contract claim. *See Tinsley*, 4 F. Supp. 3d 805 at 833–35 (also providing four factors for the gist of the action doctrine). However, Defendants provide neither the standard for the gist of the action doctrine nor an application thereof to the present case, (*see* ECF No. 29), and, because it was not previously raised, Plaintiffs had no opportunity to respond to its mere incantation, *see Parsley,* 2024 WL 712873, at *9, n.6; *Spurling*, 2025 WL 1840669, at *12.

Accordingly, Defendants' Motion to Dismiss, (ECF No. 22), is **DENIED WITHOUT PREJUDICE** insofar as it argues that Plaintiffs' WVCCPA claim is barred under the gist of the action doctrine.

**2. WVCCPA Claim**

The WVCCPA prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. In the

pending motion, Defendants argue that Plaintiffs failed to plausibly allege (1) an unfair practice or (2) conduct of any trade or commerce. (ECF No. 23 at 16–20.) Plaintiffs contest each argument. (*See* ECF No. 28 at 11–20.) Each issue is discussed below in turn.

i. "Unfair Method of Competition" or "Unfair or Deceptive Act or Practice"

First, Defendants argue that "Plaintiffs have not plausibly alleged that Aramark's conduct is an 'unfair method[] of competition' or constitutes an 'unfair or deceptive act[] or practice[]' within the meaning of the statute." (ECF No. 23 at 17–18.) Plaintiffs contend otherwise. (ECF No. 29 at 12–13.) The Court agrees with Plaintiffs.

"Unfair methods of competition and unfair or deceptive acts or practices," under the WVCCPA "means and *includes, but is not limited to*, any one or more" of sixteen examples. W. Va. Code § 46A-6-102(7); *see also Smith v. Collection Techs., Inc.*, No. 2:15-CV-06816, 2016 WL 1169529, at *10 (S.D. W. Va. Mar. 22, 2016) (Johnston, J.) (noting that "the statute makes clear that the statutory list providing examples of conduct prohibited by § 104 is not exhaustive").[7] Whether an act constitutes an unfair method of competition or an unfair or deceptive act or practice is informed by a variety of sources. In particular, because the legislative intent in enacting the WVCCPA was to "complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices," the statute specifically instructs that "courts be guided by . . . interpretations given by . . . the federal courts to Section 5(a)(1) of the Federal Trade Commission Act . . . and to the various other federal statutes dealing with the same or similar matters." *See* W. Va. Code § 46A-6-101(1)–(2) (also instructing that "this article shall be liberally construed" but not "construed to prohibit acts or practices which are reasonable in relation to the

[7] Clearly, Defendants' argument that Plaintiffs have failed to state a claim because "none of the sixteen listed practices apply," (ECF No. 23 at 17), fails.

development and preservation of business or which are not injurious to the public interest"). To that extent, Section 5(a) of the Federal Trade Commission Act ("FTCA") defines a practice as "unfair" if it meets three elements: it "[1] causes or is likely to cause substantial injury to consumers which is [2] not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n); *see also FTC v. Corpay, Inc.*, 164 F.4th 807, 838 (11th Cir. 2026).

Here, Plaintiffs allege that Defendants' scheme constitutes an unfair practice. (*See* ECF No. 1 at 27–28.) In the pending motion, Defendants appear[8] to challenge the first and second elements of an "unfair" practice under § 45(n). (*See* ECF No. 23 at 18–20.) As discussed below, Defendants' arguments fail.

To start, Defendants seemingly challenge the first element—that the alleged scheme did not cause or is not likely to cause Plaintiffs a substantial injury[9]—by arguing that Plaintiffs have not plausibly alleged that Defendants failed to provide adequate free meals. (ECF No. 23 at 18.) Similarly, Defendants appear to challenge the second element—that Plaintiffs could not avoid this

---

[8] Defendants seem to question that the FTCA standard is applicable, (*see* ECF No. 23 at 18 (arguing that Plaintiffs have failed to state a claim, "[e]ven if" the Court applied this "nebulous" and "undefined" standard)), but fail to offer any argument with merit against the clear legislative intent, *see* W. Va. Code § 46A-6-101(1). Defendants argue that W. Va. Code § 46A-6-101(1) "permits courts to be 'guided by the policies' in 15 U.S.C. § 45(a)(1) . . . which is a different section from § 45(n)." (ECF No. 29 at 8.) However, as provided above, § 46A-6-101(1) directs courts to look at how federal courts interpret § 45(a)(1) of the FTCA. Section (a)(1) only provides that "[u[nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). In interpreting § 45(a)(1), federal courts obviously use the definition of an "unfair" practice provided in § 45(n)). *See, e.g.*, *Corpay, Inc.*, 164 F.4th at 838; *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010); *Traffic Jam Events, L.L.C. v. FTC*, No. 21-60947, 2025 WL 1904566, at *5 (5th Cir. July 10, 2025); *FTC. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1873989, at *55, n.62 (D. Kan. Feb. 27, 2020) (noting that other states apply the FTCA's § 45(a) elements in interpreting their state consumer credit and protection statute and, even though "West Virginia has not adopted this test explicitly, [] the [WVCCPA] instructs courts construing that act to" be guided by federal courts' interpretations of the FTCA (citing W. Va. Code § 46A-6-101(1))).

[9] The alleged substantial harm is monetary damages. (*See* ECF No. 1 at 27, ¶ 135; ECF No. 28 at 14–15.)

substantial injury—by insisting that Plaintiffs were not forced to purchase food. (*Id.* at 18; *see also id.* at 19–20 (reasoning that "[a]t best, Plaintiffs' allegations establish that they are dissatisfied with their food in prison," which "is a far cry from establishing the type of life-or-death deprivation of 'basic needs' upon which Plaintiffs' theory depends").) For support, Defendants claim that Plaintiffs' reliance on a 2023 report from the West Virginia Center on Budget & Policy, an alleged 2022 comment from the Agriculture Commissioner, and "stories from incarcerated consumers . . . set forth in grievances and letters," is misplaced and/or insufficient to support their claims. (*See id.* at 18–20; ECF No. 29 at 10–11.)

Even if these exhibits did not support Plaintiffs' claims,[10] the allegations in the Complaint are sufficient to state a plausible claim under the WVCCPA. Plaintiffs' alleged substantial injury is "monetary harm." (ECF No. 1 at 27, ¶ 135.) As to the first FTCA element, Plaintiffs claim that Defendants' scheme caused and will continue to cause this substantial injury by failing "to provide adequate free daily meals services," which are "essential to the health, safety, and overall welfare of people incarcerated" in West Virginia. (*Id.*) As Plaintiffs note, even if they "are getting enough free food from Aramark in order to *survive*," when "[f]aced with a lack of wholesome and sufficient food, people will pursue alternative sources." (ECF No. 28 at 16.) Although Defendants contend that "prisoners have a right to adequate food, but not to food that is tasty or even appetizing," (ECF No. 29 at 11 (internal citations omitted)), Plaintiffs specifically allege that Defendants' free daily meals are *not* adequate, (*see, e.g.*, ECF No. 1 at 27, ¶ 135; *id.* at

[10] The Court may consider extrinsic evidence at the 12(b)(6) stage if such evidence "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc*., 190 F.3d 609, 618 (4th Cir. 1999)), but, at its core, a motion to dismiss typically tests the legal sufficiency of the well-pleaded factual allegations in the complaint, *Twombly*, 550 U.S. at 570. Here, even if the exhibits do not *support* Plaintiffs' claims, they do not contradict the well-pleaded allegations.

11, ¶ 39 ("Aramark provides inadequate daily meals services by providing inadequate quantities of food, inappropriately reusing left over and spoiled food, and failing to serve required amounts and varieties of fresh foods such as vegetables, unprocessed meats, and dairy.")).

As to the second element, Plaintiffs claim that the "cannot reasonably avoid" buying food from Defendants, who have exclusive control over their food provisions. (*Id.*) To determine whether an injury was "reasonably avoidable" under the FTCA, courts generally "look to whether the consumers had a free and informed choice." *See, e.g.*, *Neovi, Inc.*, 604 F.3d at 1158; *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985); *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365–66 (11th Cir. 1988)). Although Defendants contend that the only reason Plaintiffs do not have a free choice is because "*they are in prison*," (ECF No. 29 at 12), they would nonetheless have a choice if they were provided adequate free meals. To the extent that Plaintiffs could have gone without food beyond the alleged inadequate free meals, it is nevertheless plausible that to do so would have been unreasonable. (*See* ECF No. 28 at 19; *cf.* 15 U.S.C. § 45(n).)

Taken as true, these factual allegations make it plausible that Defendants have engaged in an "unfair" practice. See *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

ii. <u>"Trade or Commerce"</u>

Second, Defendants contend that "Plaintiffs cannot assert a claim under the WVCCPA because their claim is necessarily based on Aramark's provision of *free* food." (ECF No. 23 at 16.) Defendants note that the WVCCPA defines "trade or commerce" as "the advertising, offering for *sale*, *sale* or distribution of any goods or services." (*Id.* (quoting W. Va. Code § 46A-6-102(6)).) Based on that definition, Defendants reason that "[b]ecause there was no sale of this

free food to the prisoners, Plaintiffs have not and cannot allege an unfair practice "in the conduct of any trade or commerce." (*Id.*; *id.* at 16–17 (collecting cases where "courts have rejected similar consumer claims brought by incarcerated individuals against Aramark for this very reason").) Defendants further assert that "Plaintiffs cannot state a valid claim by carving their theory of liability in half" by "focusing on the second part of the alleged 'scheme,'" in which Defendants are allegedly "engaging in trade or commerce when it offers food for sale to incarcerated people and their loved ones." (*Id.* at 17 (internal quotations and citations omitted).)

This argument is unavailing. As Plaintiffs note, their WVCCPA claim is premised on Defendants' food-for-purchase options. (ECF No. 28 at 13–14; *see also, e.g.*, ECF No. 1 at 7–8, ¶¶ 24–25 (alleging that Defendants' scheme has "three components: (1) obtaining exclusive control over all of the food provisions available to incarcerated people by acquiring the commissary business of Union Supply, (2) maintaining an inadequate quality, quantity, and variety of food in the daily meals services that it is required to provide to incarcerated people through its contract with the State, and (3) developing more food-for-purchase programs such as Fresh Favorites and iCare" which results in "incarcerated people and their family members and loved ones are buying food they would not otherwise buy to supplement incarcerated people's diets, resulting in direct profits to Aramark at the expense of incarcerated people and their families.").) Thus, Defendants' scheme certainly includes an "inadequate provision of free daily meals," (ECF No. 28 at 14; *see also* ECF No. 1 at 7–8, ¶¶ 24–25), but Defendants cannot carve Plaintiffs' theory of liability into thirds and ignore the component that involves trade or commerce, (*cf.* ECF No. 23 at 17). Undeniably, the overall nature of the alleged scheme focuses on "extort[ing] profits from incarcerated consumers and their loved ones." (*See, e.g.*, ECF No. 1 at 2, ¶ 3.) Obtaining a

monopoly on food supplies and allegedly failing to provide adequate daily meal services are just a means to an end of the scheme.[11]

To that end, Plaintiffs allege that Defendants have sold them food. (*See generally* ECF No. 1; *see also* W. Va. Code § 46A-6-102(6).) Thus, Plaintiffs have sufficiently alleged an unfair practice "in the conduct of any trade or commerce." *See* W. Va. Code § 46A-6-104.

Accordingly, Defendants' Motion to Dismiss is **DENIED** insofar as they argue that Plaintiffs have failed to state a claim under the WVCCPA.

### 3. Economic Duress Claim

Under West Virginia law, there are three elements to economic duress: (1) plaintiff was forced into a transaction, (2) the compulsion was based on unlawful threats or wrongful, oppressive, unconscionable conduct by the defendant, and (3) plaintiff was left with no reasonable alternative but to acquiesce. *Machinery Hauling, Inc. v. Steel of West Virginia*, 384 S.E.2d 139, 142 (W. Va. 1989); *Holmes v. Runyan & Assoc., Inc.*, No. CIV.A. 2:09-0679, 2009 WL 5063305, at *3 (S.D. W. Va. Dec. 15, 2009) (Copenhaver, J.); *Huntington Nat'l Bank v. Hard Rock Expl., Inc.*, No. 1:16CV48, 2017 WL 2129306, at *3 (N.D. W. Va. May 16, 2017) (Stamp, J.). "[W]hile economic duress principles are more prevalent in contract cases," they can arise under a tort theory. *Mach. Hauling, Inc.*, 384 S.E.2d at 143. Under the tort theory, (1) "the duty is deemed to be the reasonable use of the superior economic power of the defendant," (2) "[t]he breach is using such power unlawfully or unreasonably," and (3) "[t]he proximate cause is shown by the fact that the victim had no reasonable recourse but to acquiesce in the unlawful conduct of the defendant and

[11] As Plaintiffs explained, Defendants rely on cases that are distinct from the present case because the plaintiffs in those cases did not purchase food from Defendants. (ECF No. 28 at 14.) Defendants maintain that the plaintiffs in those cases were provided free food, (ECF No. 29 at 10, n.2), a fact that was not contested, (*see* ECF No. 28 at 14), without addressing the material distinction that Plaintiffs note, (ECF No. 29 at 10, n.2).

is damaged thereby." *Id.* (recognizing that "this tort theory is not substantially different from the economic duress theory under a contract analysis").

As to the second element, "determining what type of threat is sufficient to invoke the rule" is "difficult." *Id.* at 142. However, a threat of "direct dire harm" is not essential. *Id.* In fact, the focus is on the balance between the second and third element: "whether the threat overbears the exercise of free will." *Id.* (but recognizing that "courts have tended to avoid the term 'free will,'" and, instead, have utilized the concept that the victim had "no reasonable alternative").

Here, Defendants utilize the contracts elements in arguing that Plaintiffs have not plausibly alleged a claim for economic duress. (ECF No. 23 at 20.) Similar to their arguments related to Plaintiffs' other claims, Defendants assert that Plaintiffs have not plausibly alleged that they (1) "were sufficiently deprived of free food," (2) were "'forced' into buying food from Aramark," or (3) "had no reasonable alternative to doing so." (*Id.*) These arguments fail for the same reasons explained above. (*See also* ECF No. 28 at 21.) The Court also notes that, while Defendants have argued that Plaintiffs receive free meals that are adequate enough to "survive," "direct dire harm" is not required. *See Mach. Hauling, Inc.*, 384 S.E.2d at 142.

Rather, at the motion to dismiss stage, Plaintiffs have plausibly alleged an economic duress tort claim. As to the first element, Plaintiffs claim that "Aramark," which "is a multibillion-dollar, Fortune 500 company," has "superior economic power" over Plaintiffs, who are "captive consumers" and have no other food options. (*See* ECF No. 1 at 29, ¶ 145 (also noting that the incarcerated plaintiffs "have no ability to earn meaningful wages").) As to the second element, Plaintiffs assert that Defendants have "used this power unlawfully, oppressively, and unreasonably by effectuating its food services scheme." (*Id.*, ¶ 146; *see also id.* at 27, ¶ 135 ("Aramark's

conduct is acutely oppressive and unscrupulous because it is using a commodity essential for survival as a tool to extort profits off a captive market."); *id.* at 28, ¶ 137 ("Aramark is exploiting its position . . . and unreasonably taking advantage of the obstacle Plaintiffs and the classes face: they have no choice but to purchase food from Aramark.").)

As to the third element, Plaintiffs have sufficiently alleged that they did not have any other reasonable choice but to buy food from Defendants, as discussed above. Defendants argue that "[t]he existence of few or no market alternatives in prison" is a "structural condition of confinement." (ECF No. 29 at 14.) Further, "Plaintiffs could reasonably avoid the alleged harm—paying for commissary items—by not purchasing them." (*Id.*)

Perhaps. However, the Court must view the well-pleaded factual allegations in the Complaint "in the light most favorable" to Plaintiffs. *See Twombly*, 550 U.S. at 570. In doing so, the issue is not simply whether Plaintiffs had no other market alternatives. The correctly framed issue is whether Plaintiffs had no other reasonable choice but to purchase food from Defendants *because* Defendants were allegedly not providing adequate free meals.[12] To that extent, Plaintiffs' allegations "raise a right to relief above the speculative level" in that the threat of not receiving adequate nutritional meals left Plaintiffs without any other reasonable alternative other than purchasing food. *See id.*; *see also Mach. Hauling, Inc.*, 384 S.E.2d at 142 (providing that the focus is on the balance between the second and third element: "whether the threat overbears the exercise of free will").

---

[12] Contrary to Defendants' implications, (*see* ECF Nos. 23 at 20; 29 at 14), this is certainly more of a "hard choice" than whether to enter into a contract, *cf. Panetta v. Chesapeake Energy Corp.*, No. CIV.A. 2:10-CV-00278, 2010 WL 1930160, at *3 (S.D. W. Va. May 12, 2010).

Accordingly, Defendants' Motion to Dismiss, (ECF No. 22), is **DENIED** as to Plaintiffs' Economic Duress claim.

**4. Unjust Enrichment Claim**

Unjust enrichment is "a species of quasi contract relief." *Gulfport Energy Corp. v. Harbert Priv. Equity Partners, LP*, 851 S.E.2d 817, 823 (W. Va. 2020). "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (quoting *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 n.2 (W. Va. 1984)). The Supreme Court of Appeals of West Virginia ("SCAWV") has generally "indicated that if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value." *Realmark Devs., Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000) (citing *Copley v. Mingo County Board of Education*, 466 S.E.2d 139 (W. Va. 1995)). "To maintain a claim of unjust enrichment, the following elements must be proven: (1) a benefit conferred upon the defendant [by the plaintiff], (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Barker v. Naik*, No. 2:17-CV-04387, 2018 WL 3824376, at *5 (S.D.W. Va. Aug. 10, 2018) (Johnston, C.J.) (internal quotation marks and punctuation omitted); *see also Johnson v. Ross*, 419 F. App'x 357, 361 (4th Cir. 2011) ("The threshold question is whether Plaintiffs conferred on [defendant] individually a benefit which would be inequitable for him to retain without making payment to Plaintiffs.").

Here, Defendants appear to challenge the third element. (*See* ECF No. 23 at 20–21.) Specifically, Defendants argue that "because Plaintiffs have not plausibly alleged that they were coerced into purchasing food from Aramark, they cannot plead that it would be inequitable for Aramark to retain the money they allegedly spent." (*Id.* at 21; *see also* ECF No. 29 at 14 ("[W]hether Plaintiffs have stated a claim for unjust enrichment rises or falls on whether Plaintiffs have adequately alleged an unlawful scheme that forced Plaintiffs to purchase food from Aramark.").) However, as discussed above, Plaintiffs have plausibly alleged that they were forced to purchase food from Defendants. (*See also* ECF No. 28 at 22.)

Accordingly, Defendants' Motion to Dismiss, (ECF No. 22), is **DENIED** as to Plaintiffs' Unjust Enrichment claim.

### *IV. CONCLUSION*

For these reasons, Defendants' Motion to Dismiss, (ECF No. 22), is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: August 19, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE